# VIMAR SEGUROS Y REASEGUROS, S. A. *v.* M/V SKY REEFER ET AL.

No. 94–623.   Argued March 20, 1995—Decided June 19, 1995

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, SOUTER, THOMAS, and GINSBURG, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 541. STEVENS, J., filed a dissenting opinion, *post*, p. 542. BREYER, J., took no part in the consideration or decision of the case.

*Stanley McDermott III* argued the cause for petitioner. With him on the briefs was *Lawrence S. Robbins*.

*Thomas H. Walsh, Jr.*, argued the cause for respondents. With him on the brief was *John J. Finn.**

JUSTICE KENNEDY delivered the opinion of the Court.

This case requires us to interpret the Carriage of Goods by Sea Act (COGSA), 46 U. S. C. App. § 1300 *et seq.*, as it relates to a contract containing a clause requiring arbitration in a foreign country. The question is whether a foreign arbitration clause in a bill of lading is invalid under COGSA because it lessens liability in the sense that COGSA prohibits. Our holding that COGSA does not forbid selection of the foreign forum makes it unnecessary to resolve the further question whether the Federal Arbitration Act (FAA), 9 U. S. C. § 1 *et seq.* (1988 ed. and Supp. V), would override COGSA were it interpreted otherwise. In our view, the relevant provisions of COGSA and the FAA are in accord, not in conflict.

I

The contract at issue in this case is a standard form bill of lading to evidence the purchase of a shipload of Moroccan oranges and lemons. The purchaser was Bacchus Associates (Bacchus), a New York partnership that distributes fruit at wholesale throughout the Northeastern United States. Bacchus dealt with Galaxie Negoce, S. A. (Galaxie), a Moroccan fruit supplier. Bacchus contracted with Galaxie to purchase the shipload of fruit and chartered a ship to transport it from Morocco to Massachusetts. The ship was the M/V Sky Reefer, a refrigerated cargo ship owned by M. H. Maritima, S. A., a Panamanian company, and time-chartered to Nichiro Gyogyo Kaisha, Ltd., a Japanese company. Stevedores

---

*Marilyn L. Lytle* filed a brief for the American Association of Exporters and Importers et al. as *amici curiae* urging reversal.

*Michael F. Sturley* filed a brief for the American Steamship Owners Mutual Protection and Indemnity Association, Inc., et al. as *amici curiae* urging affirmance.

hired by Galaxie loaded and stowed the cargo. As is customary in these types of transactions, when it received the cargo from Galaxie, Nichiro as carrier issued a form bill of lading to Galaxie as shipper and consignee. Once the ship set sail from Morocco, Galaxie tendered the bill of lading to Bacchus according to the terms of a letter of credit posted in Galaxie's favor.

Among the rights and responsibilities set out in the bill of lading were arbitration and choice-of-law clauses. Clause 3, entitled "Governing Law and Arbitration," provided:

> "(1) The contract evidenced by or contained in this Bill of Lading shall be governed by the Japanese law.
> "(2) Any dispute arising from this Bill of Lading shall be referred to arbitration in Tokyo by the Tokyo Maritime Arbitration Commission (TOMAC) of The Japan Shipping Exchange, Inc., in accordance with the rules of TOMAC and any amendment thereto, and the award given by the arbitrators shall be final and binding on both parties." App. 49.

When the vessel's hatches were opened for discharge in Massachusetts, Bacchus discovered that thousands of boxes of oranges had shifted in the cargo holds, resulting in over $1 million damage. Bacchus received $733,442.90 compensation from petitioner Vimar Seguros y Reaseguros (Vimar Seguros), Bacchus' marine cargo insurer that became subrogated *pro tanto* to Bacchus' rights. Petitioner and Bacchus then brought suit against Maritima *in personam* and M/V Sky Reefer *in rem* in the District Court for the District of Massachusetts under the bill of lading. These defendants, respondents here, moved to stay the action and compel arbitration in Tokyo under clause 3 of the bill of lading and § 3 of the FAA, which requires courts to stay proceedings and enforce arbitration agreements covered by the Act. Petitioner and Bacchus opposed the motion, arguing the arbitra-

tion clause was unenforceable under the FAA both because it was a contract of adhesion and because it violated COGSA § 3(8). The premise of the latter argument was that the inconvenience and costs of proceeding in Japan would "lesse[n] . . . liability" as those terms are used in COGSA.

The District Court rejected the adhesion argument, observing that Congress defined the arbitration agreements enforceable under the FAA to include maritime bills of lading, 9 U. S. C. § 1, and that petitioner was a sophisticated party familiar with the negotiation of maritime shipping transactions. It also rejected the argument that requiring the parties to submit to arbitration would lessen respondents' liability under COGSA § 3(8). The court granted the motion to stay judicial proceedings and to compel arbitration; it retained jurisdiction pending arbitration; and at petitioner's request, it certified for interlocutory appeal under 28 U. S. C. § 1292(b) its ruling to compel arbitration, stating that the controlling question of law was "whether [COGSA § 3(8)] nullifies an arbitration clause contained in a bill of lading governed by COGSA." Pet. for Cert. 30a.

The First Circuit affirmed the order to arbitrate. 29 F. 3d 727 (1994). Although it expressed grave doubt whether a foreign arbitration clause lessened liability under COGSA § 3(8), *id.*, at 730, the Court of Appeals assumed the clause was invalid under COGSA and resolved the conflict between the statutes in favor of the FAA, which it considered to be the later enacted and more specific statute, *id.*, at 731–733. We granted certiorari, 513 U. S. 1013 (1995), to resolve a Circuit split on the enforceability of foreign arbitration clauses in maritime bills of lading. Compare the case below (enforcing foreign arbitration clause assuming *arguendo* it violated COGSA), with *State Establishment for Agricultural Product Trading* v. *M/V Wesermunde*, 838 F. 2d 1576 (CA11) (declining to enforce foreign arbitration clause because that would violate COGSA), cert. denied, 488 U. S. 916 (1988). We now affirm.

## II

The parties devote much of their argument to the question whether COGSA or the FAA has priority. "[W]hen two statutes are capable of co-existence," however, "it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U. S. 535, 551 (1974); *Pittsburgh & Lake Erie R. Co.* v. *Railway Labor Executives' Assn.*, 491 U. S. 490, 510 (1989). There is no conflict unless COGSA by its own terms nullifies a foreign arbitration clause, and we choose to address that issue rather than assume nullification *arguendo*, as the Court of Appeals did. We consider the two arguments made by petitioner. The first is that a foreign arbitration clause lessens COGSA liability by increasing the transaction costs of obtaining relief. The second is that there is a risk foreign arbitrators will not apply COGSA.

### A

The leading case for invalidation of a foreign forum selection clause is the opinion of the Court of Appeals for the Second Circuit in *Indussa Corp.* v. *S. S. Ranborg*, 377 F. 2d 200 (1967) (en banc). The court there found that COGSA invalidated a clause designating a foreign judicial forum because it "puts 'a high hurdle' in the way of enforcing liability, and thus is an effective means for carriers to secure settlements lower than if cargo [owners] could sue in a convenient forum." *Id.*, at 203 (citation omitted). The court observed "there could be no assurance that [the foreign court] would apply [COGSA] in the same way as would an American tribunal subject to the uniform control of the Supreme Court." *Id.*, at 203–204. Following *Indussa*, the Courts of Appeals without exception have invalidated foreign forum selection clauses under § 3(8). See *Union Ins. Soc. of Canton, Ltd.* v. *S. S. Elikon*, 642 F. 2d 721, 723–725 (CA4 1981); *Conklin & Garrett, Ltd* v. *M/V Finnrose*, 826 F. 2d 1441, 1442–1444 (CA5 1987); see also G. Gilmore & C. Black, Law of Admiralty

145–146, n. 23 (2d ed. 1975) (approving *Indussa* rule). As foreign arbitration clauses are but a subset of foreign forum selection clauses in general, *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506, 519 (1974), the *Indussa* holding has been extended to foreign arbitration clauses as well. See *State Establishment for Agricultural Product Trading, supra*, at 1580–1581; cf. *Vimar Seguros y Reaseguros, supra*, at 730, (assuming, *arguendo*, *Indussa* applies). The logic of that extension would be quite defensible, but we cannot endorse the reasoning or the conclusion of the *Indussa* rule itself.

The determinative provision in COGSA, examined with care, does not support the arguments advanced first in *Indussa* and now by petitioner. Section 3(8) of COGSA provides as follows:

> "Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect." 46 U. S. C. App. § 1303(8).

The liability that may not be lessened is "liability for loss or damage . . . arising from negligence, fault, or failure in the duties and obligations provided in this section." The statute thus addresses the lessening of the specific liability imposed by the Act, without addressing the separate question of the means and costs of enforcing that liability. The difference is that between explicit statutory guarantees and the procedure for enforcing them, between applicable liability principles and the forum in which they are to be vindicated.

The liability imposed on carriers under COGSA § 3 is defined by explicit standards of conduct, and it is designed to correct specific abuses by carriers. In the 19th century it was a prevalent practice for common carriers to insert

clauses in bills of lading exempting themselves from liability for damage or loss, limiting the period in which plaintiffs had to present their notice of claim or bring suit, and capping any damages awards per package. See 2A M. Sturley, Benedict on Admiralty § 11, pp. 2–2 to 2–3 (1995); 2 T. Schoenbaum, Admiralty and Maritime Law § 10–13 (2d ed. 1994); Yancey, The Carriage of Goods: Hague, COGSA, Visby, and Hamburg, 57 Tulane L. Rev. 1238, 1239–1240 (1983). Thus, § 3, entitled "Responsibilities and liabilities of carrier and ship," requires that the carrier "exercise due diligence to . . . [m]ake the ship seaworthy" and "[p]roperly man, equip, and supply the ship" before and at the beginning of the voyage, § 3(1), "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried," § 3(2), and issue a bill of lading with specified contents, § 3(3). 46 U. S. C. App. §§ 1303(1), (2), and (3). Section 3(6) allows the cargo owner to provide notice of loss or damage within three days and to bring suit within one year. These are the substantive obligations and particular procedures that § 3(8) prohibits a carrier from altering to its advantage in a bill of lading. Nothing in this section, however, suggests that the statute prevents the parties from agreeing to enforce these obligations in a particular forum. By its terms, it establishes certain duties and obligations, separate and apart from the mechanisms for their enforcement.

Petitioner's contrary reading of § 3(8) is undermined by the Court's construction of a similar statutory provision in *Carnival Cruise Lines, Inc.* v. *Shute,* 499 U. S. 585 (1991). There a number of Washington residents argued that a Florida forum selection clause contained in a cruise ticket should not be enforced because the expense and inconvenience of litigation in Florida would "caus[e] plaintiffs unreasonable hardship in asserting their rights," *id.,* at 596, and therefore " 'lessen, weaken, or avoid the right of any claimant to a trial by court of competent jurisdiction on the question of liability for . . . loss or injury, or the measure of damages therefor' "

in violation of the Limitation of Vessel Owner's Liability Act, *id.*, at 595–596 (quoting 46 U. S. C. App. § 183c). We observed that the clause "does not purport to limit petitioner's liability for negligence," 499 U. S., at 596–597, and enforced the agreement over the dissent's argument, based in part on the *Indussa* line of cases, that the cost and inconvenience of traveling thousands of miles "lessens or weakens [plaintiffs'] ability to recover," 499 U. S., at 603 (STEVENS, J., dissenting).

If the question whether a provision lessens liability were answered by reference to the costs and inconvenience to the cargo owner, there would be no principled basis for distinguishing national from foreign arbitration clauses. Even if it were reasonable to read § 3(8) to make a distinction based on travel time, airfare, and hotels bills, these factors are not susceptible of a simple and enforceable distinction between domestic and foreign forums. Requiring a Seattle cargo owner to arbitrate in New York likely imposes more costs and burdens than a foreign arbitration clause requiring it to arbitrate in Vancouver. It would be unwieldy and unsupported by the terms or policy of the statute to require courts to proceed case by case to tally the costs and burdens to particular plaintiffs in light of their means, the size of their claims, and the relative burden on the carrier.

Our reading of "lessening such liability" to exclude increases in the transaction costs of litigation also finds support in the goals of the Brussels Convention for the Unification of Certain Rules Relating to Bills of Lading, 51 Stat. 233 (1924) (Hague Rules), on which COGSA is modeled. Sixty-six countries, including the United States and Japan, are now parties to the Convention, see Department of State, Office of the Legal Adviser, Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 1994, p. 367 (June 1994), and it appears that none has interpreted its enactment of § 3(8) of the Hague Rules to prohibit foreign forum selection clauses, see Sturley, International Uniform Laws in National Courts:

The Influence of Domestic Law in Conflicts of Interpretation, 27 Va. J. Int'l L. 729, 776–796 (1987). The English courts long ago rejected the reasoning later adopted by the *Indussa* court. See *Maharani Woollen Mills Co.* v. *Anchor Line,* [1927] 29 Lloyd's List L. Rep. 169 (C. A.) (Scrutton, L. J.) ("[T]he liability of the carrier appears to me to remain exactly the same under the clause. The only difference is a question of procedure—where shall the law be enforced?—and I do not read any clause as to procedure as lessening liability"). And other countries that do not recognize foreign forum selection clauses rely on specific provisions to that effect in their domestic versions of the Hague Rules, see, *e. g.,* Sea-Carriage of Goods Act 1924, § 9(2) (Australia); Carriage of Goods by Sea Act, No. 1 of 1986, § 3 (South Africa). In light of the fact that COGSA is the culmination of a multilateral effort "to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade," *Robert C. Herd & Co.* v. *Krawill Machinery Corp.,* 359 U. S. 297, 301 (1959), we decline to interpret our version of the Hague Rules in a manner contrary to every other nation to have addressed this issue. See Sturley, *supra,* at 736 (conflicts in the interpretation of the Hague Rules not only destroy esthetic symmetry in the international legal order but impose real costs on the commercial system the Rules govern).

It would also be out of keeping with the objects of the Convention for the courts of this country to interpret COGSA to disparage the authority or competence of international forums for dispute resolution. Petitioner's skepticism over the ability of foreign arbitrators to apply COGSA or the Hague Rules, and its reliance on this aspect of *Indussa Corp.* v. *S. S. Ranborg,* 377 F. 2d 200 (CA2 1967), must give way to contemporary principles of international comity and commercial practice. As the Court observed in *The Bremen* v. *Zapata Off-Shore Co.,* 407 U. S. 1 (1972), when it enforced a foreign forum selection clause, the historical judicial resist-

ance to foreign forum selection clauses "has little place in an era when . . . businesses once essentially local now operate in world markets." *Id.*, at 12. "The expansion of American business and industry will hardly be encouraged," we explained, "if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts." *Id.*, at 9. See *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 638 (1985) (if international arbitral institutions "are to take a central place in the international legal order, national courts will need to 'shake off the old judicial hostility to arbitration,' and also their customary and understandable unwillingness to cede jurisdiction of a claim arising under domestic law to a foreign or transnational tribunal") (citation omitted); *Scherk* v. *Alberto-Culver Co.*, 417 U. S., at 516 ("A parochial refusal by the courts of one country to enforce an international arbitration agreement" would frustrate "the orderliness and predictability essential to any international business transaction"); see also Allison, Arbitration of Private Antitrust Claims in International Trade: A Study in the Subordination of National Interests to the Demands of a World Market, 18 N. Y. U. J. Int'l Law & Pol. 361, 439 (1986).

That the forum here is arbitration only heightens the irony of petitioner's argument, for the FAA is also based in part on an international convention, 9 U. S. C. § 201 *et seq.* (codifying the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, [1970] 21 U. S. T. 2517, T. I. A. S. No. 6997), intended "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries," *Scherk, supra,* at 520, n. 15. The FAA requires enforcement of arbitration agreements in contracts that involve interstate commerce, see *Allied-Bruce Terminix Cos.* v. *Dobson,* 513 U. S. 265 (1995), and in maritime transactions, including bills

of lading, see 9 U. S. C. §§ 1, 2, 201, 202, where there is no independent basis in law or equity for revocation, cf. *Carnival Cruise Lines,* 499 U. S., at 595 ("[F]orum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness"). If the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements. That concern counsels against construing COGSA to nullify foreign arbitration clauses because of inconvenience to the plaintiff or insular distrust of the ability of foreign arbitrators to apply the law.

## B

Petitioner's second argument against enforcement of the Japanese arbitration clause is that there is no guarantee foreign arbitrators will apply COGSA. This objection raises a concern of substance. The central guarantee of § 3(8) is that the terms of a bill of lading may not relieve the carrier of the obligations or diminish the legal duties specified by the Act. The relevant question, therefore, is whether the substantive law to be applied will reduce the carrier's obligations to the cargo owner below what COGSA guarantees. See *Mitsubishi Motors, supra,* at 637, n. 19.

Petitioner argues that the arbitrators will follow the Japanese Hague Rules, which, petitioner contends, lessen respondents' liability in at least one significant respect. The Japanese version of the Hague Rules, it is said, provides the carrier with a defense based on the acts or omissions of the stevedores hired by the shipper, Galaxie, see App. 112, Article 3(1) (carrier liable "when he or the persons employed by him" fail to take due care), while COGSA, according to petitioner, makes nondelegable the carrier's obligation to "properly and carefully . . . stow . . . the goods carried," COGSA § 3(2), 46 U. S. C. App. § 1303(2); see *Associated Metals &*

*Minerals Corp.* v. *M/V Arktis Sky,* 978 F. 2d 47, 50 (CA2 1992). But see COGSA § 4(2)(i), 46 U. S. C. App. § 1304(2)(i) ("Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from . . . [a]ct or omission of the shipper or owner of the goods, his agent or representative"); COGSA § 3(8), 46 U. S. C. App. § 1303(8) (agreement may not relieve or lessen liability "otherwise than as provided in this chapter"); Hegarty, A COGSA Carrier's Duty to Load and Stow Cargo is Nondelegable, or Is It?: *Associated Metals & Minerals Corp.* v. *M/V Arktis Sky,* 18 Tulane Mar. L. J. 125 (1993).

Whatever the merits of petitioner's comparative reading of COGSA and its Japanese counterpart, its claim is premature. At this interlocutory stage it is not established what law the arbitrators will apply to petitioner's claims or that petitioner will receive diminished protection as a result. The arbitrators may conclude that COGSA applies of its own force or that Japanese law does not apply so that, under another clause of the bill of lading, COGSA controls. Respondents seek only to enforce the arbitration agreement. The District Court has retained jurisdiction over the case and "will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the . . . laws has been addressed." *Mitsubishi Motors, supra,* at 638; cf. 1 Restatement (Third) of Foreign Relations Law of the United States § 482(2)(d) (1986) ("A court in the United States need not recognize a judgment of the court of a foreign state if . . . the judgment itself, is repugnant to the public policy of the United States"). Were there no subsequent opportunity for review and were we persuaded that "the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . . , we would have little hesitation in condemning the agreement as against public policy." *Mitsubishi Motors, supra,* at 637, n. 19. Cf. *Knott* v. *Botany Mills,* 179 U. S. 69 (1900) (nullifying choice-of-law provision under the Harter Act, the statutory precursor to COGSA,

where British law would give effect to provision in bill of lading that purported to exempt carrier from liability for damage to goods caused by carrier's negligence in loading and stowage of cargo); *The Hollandia,* [1983] A. C. 565, 574–575 (H. L. 1982) (noting choice-of-forum clause "does not ex facie offend against article III, paragraph 8," but holding clause unenforceable where "the foreign court chosen as the exclusive forum would apply a domestic substantive law which would result in limiting the carrier's liability to a sum lower than that to which he would be entitled if [English COGSA] applied"). Under the circumstances of this case, however, the First Circuit was correct to reserve judgment on the choice-of-law question, 29 F. 3d, at 729, n. 3, as it must be decided in the first instance by the arbitrator, cf. *Mitsubishi Motors,* 473 U. S., at 637, n. 19. As the District Court has retained jurisdiction, mere speculation that the foreign arbitrators might apply Japanese law which, depending on the proper construction of COGSA, might reduce respondents' legal obligations, does not in and of itself lessen liability under COGSA § 3(8).

Because we hold that foreign arbitration clauses in bills of lading are not invalid under COGSA in all circumstances, both the FAA and COGSA may be given full effect. The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER took no part in the consideration or decision of this case.

JUSTICE O'CONNOR, concurring in the judgment.

I agree with what I understand to be the two basic points made in the Court's opinion. First, I agree that the language of the Carriage of Goods by Sea Act (COGSA), 46 U. S. C. App. § 1300 *et seq.,* and our decision in *Carnival Cruise Lines, Inc.* v. *Shute,* 499 U. S. 585 (1991), preclude a

holding that the increased cost of litigating in a distant forum, without more, can lessen liability within the meaning of COGSA § 3(8). *Ante,* at 534–536. Second, I agree that, because the District Court has retained jurisdiction over this case while the arbitration proceeds, any claim of lessening of liability that might arise out of the arbitrators' interpretation of the bill of lading's choice-of-law clause, or out of their application of COGSA, is premature. *Ante,* at 539–541. Those two points suffice to affirm the decision below.

Because the Court's opinion appears to do more, however, I concur only in the judgment. Foreign arbitration clauses of the kind presented here do not divest domestic courts of jurisdiction, unlike true foreign forum selection clauses such as that considered in *Indussa Corp.* v. *S. S. Ranborg,* 377 F. 2d 200 (CA2 1967) (en banc). That difference is an important one—it is, after all, what leads the Court to dismiss much of petitioner's argument as premature—and we need not decide today whether *Indussa,* insofar as it relied on considerations other than the increased cost of litigating in a distant forum, retains any vitality in the context of true foreign forum selection clauses. Accordingly, I would not, without qualification, reject "the reasoning [and] the conclusion of the *Indussa* rule itself," *ante,* at 534, nor would I wholeheartedly approve an English decision that "long ago rejected the reasoning later adopted by the *Indussa* court," *ante,* at 537. As the Court notes, "[f]ollowing *Indussa,* the Courts of Appeals without exception have invalidated foreign forum selection clauses under § 3(8)." *Ante,* at 533. I would prefer to disturb that unbroken line of authority only to the extent necessary to decide this case.

JUSTICE STEVENS, dissenting.

The Carriage of Goods by Sea Act (COGSA),[1] enacted in 1936 as a supplement to the 1893 Harter Act,[2] regulates the

---

[1] 49 Stat. 1207, 46 U. S. C. App. §§ 1300–1315.

[2] 27 Stat. 445, 46 U. S. C. App. §§ 190–196.

terms of bills of lading issued by ocean carriers transporting cargo to or from ports of the United States. Section 3(8) of COGSA provides:

> "Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect." 46 U. S. C. App. § 1303(8).

Petitioners in this case challenge the enforceability of a foreign arbitration clause, coupled with a choice-of-foreign-law clause, in a bill of lading covering a shipment of oranges from Morocco to Boston, Massachusetts. The bill, issued by the Japanese carrier, provides (1) that the transaction " 'shall be governed by the Japanese law,' " and (2) that any dispute arising from the bill shall be arbitrated in Tokyo. See *ante,* at 531. Under the construction of COGSA that has been uniformly followed by the Courts of Appeals and endorsed by scholarly commentary for decades, both of those clauses are unenforceable against the shipper because they "relieve" or "lessen" the liability of the carrier. Nevertheless, relying almost entirely on a recent case involving a domestic forum selection clause that was not even covered by COGSA, *Carnival Cruise Lines, Inc.* v. *Shute,* 499 U. S. 585 (1991), the Court today unwisely discards settled law and adopts a novel construction of § 3(8).

I

In the 19th century it was common practice for shipowners to issue bills of lading that included stipulations exempting themselves from liability for losses occasioned by the negligence of their employees. Because a bill of lading was (and is) a contract of adhesion, which a shipper must accept or else find another means to transport his goods, shippers

were in no position to bargain around these no-liability clauses. Although the English courts enforced the stipulations, see *Compania de Navigacion la Flecha* v. *Brauer,* 168 U. S. 104, 117–118 (1897), citing *Peck* v. *North Staffordshire Railway,* 10 H. L. Cas. 473, 493, 494 (1863), this Court concluded, even prior to the 1893 enactment of the Harter Act, that they were "contrary to public policy, and consequently void," *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, 442 (1889).[3]  As we noted in *Brauer,* several District Courts had held that such a stipulation was invalid even when the bill of lading also contained a choice-of-law clause providing that "the contract should be governed by the law of England." 168 U. S., at 118.  The question whether such a choice-of-law clause was itself valid remained open in this Court until the Harter Act was passed in 1893.

Section 1 of the Harter Act makes it unlawful for the master or owner of any vessel transporting cargo between ports of the United States and foreign ports to insert in any bill of lading any clause whereby the carrier "shall be relieved from liability for loss or damage arising from negligence."[4]  In

---

[3] In support of its holding in *Liverpool Steam,* the Court observed:

"The carrier and his customer do not stand upon a footing of equality. The individual customer has no real freedom of choice.  He cannot afford to higgle or stand out, and seek redress in the courts.  He prefers rather to accept any bill of lading, or to sign any paper, that the carrier presents; and in most cases he has no alternative but to do this, or to abandon his business." 129 U. S., at 441.

[4] The first section of the Harter Act provides:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge.  Any and all words or clauses of such import inserted in bills of lading or ship-

*Knott* v. *Botany Mills*, 179 U. S. 69 (1900), we were presented with the question whether that prohibition applied to a bill of lading containing a choice-of-law clause designating British law as controlling. The Court held:

> "Th[e] express provision of the act of Congress overrides and nullifies the stipulations of the bill of lading that the carrier shall be exempt from liability for such negligence, and that the contract shall be governed by the law of the ship's flag." *Id.*, at 77.

The Court's holding that the choice-of-law clause was invalid rested entirely on the Harter Act's prohibition against relieving the carrier from liability. *Id.*, at 72. Since *Knott*, courts have consistently understood the Harter Act to create a flat ban on foreign choice-of-law clauses in bills of lading. See, *e. g., Conklin & Garrett, Ltd.* v. *M/V Finnrose*, 826 F. 2d 1441, 1442–1444 (CA5 1987); *Union Ins. Soc. of Canton, Ltd.* v. *S. S. Elikon*, 642 F. 2d 721, 723–725 (CA4 1981); *Indussa Corp.* v. *S. S. Ranborg*, 377 F. 2d 200 (CA2 1967). Courts have also consistently found such clauses invalid under COGSA, which embodies an even broader prohibition against clauses "relieving" *or* "lessening" a carrier's liability. Indeed, when a panel of the Second Circuit in 1955 interpreted COGSA to permit a foreign choice-of-law clause, *Muller* v. *Swedish American Line Ltd.*, 224 F. 2d 806, scholars noted that "the case seems impossible to reconcile with the holding in *Knott.*"[5] Eventually agreeing, the en banc court unanimously overruled *Muller* in 1967. *Indussa Corp.*, 377 F. 2d, at 200.

In the 1957 edition of their treatise on the Law of Admiralty, Gilmore and Black had criticized not only the choice-

ping receipts shall be null and void and of no effect." 27 Stat. 445, 46 U. S. C. App. § 190.

This section was rendered obsolete by § 3(8) of COGSA, a broader prohibition that invalidates clauses either "relieving" or "lessening" a carrier's liability. 46 U. S. C. App. § 1303(8), quoted *supra*, at 543.

[5] G. Gilmore & C. Black, Law of Admiralty 125, n. 23 (1st ed. 1957).

of-law holding in *Muller*, but also its enforcement of a foreign choice-of-forum clause. They wrote:

> "The stipulation for suit abroad seems also to offend Cogsa, most obviously because it destroys the shipper's certainty that Cogsa will be applied. Further, it is entirely unrealistic to look on an obligation to sue overseas as not 'lessening' the liability of the carrier. It puts a high hurdle in the way of enforcing that liability." G. Gilmore & C. Black, Law of Admiralty 125, n. 23.

Judge Friendly's opinion for the en banc court in *Indussa* endorsed this reasoning. In *Indussa*, the bill of lading contained a provision requiring disputes to be resolved in Norway under Norwegian law.[6] Judge Friendly first remarked on the harsh consequence of "requiring an American consignee claiming damages in the modest sum of $2,600 to journey some 4200 miles to a court having a different legal system and employing another language." 377 F. 2d, at 201. The decision, however, rested not only on the impact of the provision on a relatively small claim, but also on a fair reading of the broad language in COGSA. Judge Friendly explained:

> "[Section] 3(8) of COGSA says that 'any clause, covenant, or agreement in a contract of carriage * * * lessening [the carrier's liability for negligence, fault, or dereliction of statutory duties] otherwise than as provided in this Act, shall be null and void and of no effect.' From a practical standpoint, to require an American plaintiff to assert his claim only in a distant court lessens the liability of the carrier quite substantially, particularly when the claim is small. Such a clause puts 'a high hur-

---

[6] The bill of lading contained the following provision:

"'Any dispute arising under this Bill of Lading shall be decided in the country where the Carrier has his principal place of business, and the law of such country shall apply except as provided elsewhere herein.'" *Indussa Corp.* v. *S. S. Ranborg*, 377 F. 2d 200, 201 (CA2 1967).

dle' in the way of enforcing liability, Gilmore & Black, supra, 125 n. 23, and thus is an effective means for carriers to secure settlements lower than if cargo could sue in a convenient forum. A clause making a claim triable only in a foreign court would almost certainly lessen liability if the law which the court would apply was neither the Carriage of Goods by Sea Act nor the Hague Rules. Even when the foreign court would apply one or the other of these regimes, requiring trial abroad *might* lessen the carrier's liability since there could be no assurance that it would apply them in the same way as would an American tribunal subject to the uniform control of the Supreme Court, and §3(8) can well be read as covering a potential and not simply a demonstrable lessening of liability." *Id.,* at 203–204 (citations omitted).

As the Court notes, *ante,* at 533, the Courts of Appeals without exception have followed *Indussa.* In the 1975 edition of their treatise, Gilmore and Black also endorsed its holding, adding this comment:

"Cogsa allows a freedom of contracting out of its terms, but only in the direction of *increasing* the shipowner's liabilities, and never in the direction of diminishing them. This apparent onesidedness is a commonsense recognition of the inequality in bargaining power which both Harter and Cogsa were designed to redress, and of the fact that one of the great objectives of both Acts is to prevent the impairment of the value and negotiability of the ocean bill of lading. Obviously, the latter result can never ensue from the increase of the carrier's duties." G. Gilmore & C. Black, Law of Admiralty 145–147 (2d ed.) (emphasis in original; footnote omitted).

Thus, our interpretation of maritime law prior to the enactment of the Harter Act, our reading of that statute in *Knott,* and the federal courts' consistent interpretation of

COGSA, buttressed by scholarly recognition of the commercial interest in uniformity, demonstrate that the clauses in the Japanese carrier's bill of lading purporting to require arbitration in Tokyo pursuant to Japanese law both would have been held invalid under COGSA prior to today.[7]

The foreign-arbitration clause imposes potentially prohibitive costs on the shipper, who must travel—and bring his lawyers, witnesses, and exhibits—to a distant country in order to seek redress. The shipper will therefore be inclined either to settle the claim at a discount or to forgo bringing the claim at all. The foreign-law clause leaves the shipper who does pursue his claim open to the application of unfamiliar and potentially disadvantageous legal standards, until he can obtain review (perhaps years later) in a domestic forum under the high standard applicable to vacation of arbitration awards.[8] See *Wilko* v. *Swan,* 346 U. S. 427, 436–437

---

[7] Of course, the objectionable feature in the instant bill of lading is a foreign arbitration clause, not a foreign forum selection clause. But this distinction is of little importance; in relevant respects, there is no difference between the two. Both impose substantial costs on shippers, and both should be held to lessen liability under COGSA. The majority's reasoning to the contrary thus presumably covers forum selection as well as arbitration. See *ante,* at 533–534; *ante,* at 542 (O'CONNOR, J., concurring in judgment). The only ground on which one might distinguish the two types of clauses is that another federal statute, the Federal Arbitration Act, makes arbitration clauses enforceable, whereas no analogous federal statute exists for forum selection clauses. For the reasons expressed *infra,* at 554–556, this distinction is unpersuasive.

[8] I am assuming that the majority would not actually uphold the application of disadvantageous legal standards—these, even under the narrowest reading of COGSA, surely lessen liability. See *ante,* at 539–541. Nonetheless, the majority is apparently willing to allow arbitration to proceed under foreign law, and to determine afterwards whether application of that law has actually lessened the carrier's formal liability. As I have discussed above, this regime creates serious problems of delay and uncertainty. Because the majority's holding in this case is limited to the enforceability of the foreign arbitration clause—it does not actually pass upon the validity of the foreign-law clause—I will not discuss the foreign-law clause further except to say that it is an unenforceable lessening of

(1953). Accordingly, courts have always held that such clauses "lessen" or "relieve" the carrier's liability, see, *e. g.*, *State Establishment for Agricultural Product Trading* v. *M/V Wesermunde*, 838 F. 2d 1576, 1580–1582 (CA11), cert. denied, 488 U. S. 916 (1988), and even the Court of Appeals in this case assumed as much, 29 F. 3d 727, 730, 732, n. 5 (CA1 1994).[9] Yet this Court today holds that carriers may insert foreign-arbitration clauses into bills of lading, and it leaves in doubt the validity of choice-of-law clauses.

Although the policy undergirding the doctrine of *stare decisis* has its greatest value in preserving rules governing commercial transactions, particularly when their meaning is well understood and has been accepted for long periods of time,[10] the Court nevertheless has concluded that a change must be made. Its law-changing decision is supported by three arguments: (1) the statutory reference to "lessening such liability" has been misconstrued; (2) the prior understanding of the meaning of the statute has been "undermined" by the *Carnival Cruise* case; and (3) the new rule is supported by our obligation to honor the 1924 "Hague Rules." None of these arguments is persuasive.

## II

The Court assumes that the words "lessening such liability" must be narrowly construed to refer only to the substantive rules that define the carrier's legal obligations. *Ante,* at 534–535. Under this view, contractual provisions that lessen the amount of the consignee's net recovery, or that

---

liability to the extent it gives an advantage to the carrier at the expense of the shipper.

[9] The Court of Appeals enforced the arbitration clause, despite its concession that the clause might violate COGSA, because of its perception that COGSA must give way to the conflicting dictate of the Federal Arbitration Act. 29 F. 3d, at 731–733. I consider, and reject, this argument *infra*, at 554–556.

[10] See Eskridge & Frickey, The Supreme Court 1993 Term—Foreword: Law as Equilibrium, 108 Harv. L. Rev. 26, 81 (1994).

lessen the likelihood that it will make any recovery at all, are beyond the scope of the statute.

In my opinion, this view is flatly inconsistent with the purpose of COGSA § 3(8). That section responds to the inequality of bargaining power inherent in bills of lading and to carriers' historic tendency to exploit that inequality whenever possible to immunize themselves from liability for their own fault. A bill of lading is a form document prepared by the carrier, who presents it to the shipper on a take-it-or-leave-it basis. See Black, The Bremen, COGSA and the Problem of Conflicting Interpretation, 6 Vand. J. Transnat'l L. 365, 368 (1973); *Liverpool Steam*, 129 U. S., at 441. Characteristically, there is no arm's-length negotiation over the bill's terms; the shipper must agree to the carrier's standard-form language, or else refrain from using the carrier's services. Accordingly, if courts were to enforce bills of lading as written, a carrier could slip in a clause relieving itself of all liability for fault, or limiting that liability to a fraction of the shipper's damages, and the shipper would have no recourse.[11] COGSA represents Congress' most recent attempt to respond to this problem. By its terms, it invalidates any clause in a bill of lading "relieving" or "lessening" the "liability" of the carrier for negligence, fault, or dereliction of duty.

---

[11] See *United States* v. *Farr Sugar Corp.*, 191 F. 2d 370, 374 (CA2 1951), aff'd, 343 U. S. 236 (1952):

"One other fact requires special note. The shipowners stress the consensual nature of the ["Both-to-Blame"] clause, arguing that a bill of lading is but a contract. But that is so at most in name only; the clause, as we are told, is now in practically all bills of lading issued by steamship companies doing business to and from the United States. Obviously the individual shipper has no opportunity to repudiate the document agreed upon by the trade, even if he has actually examined it and all its twenty-eight lengthy paragraphs, of which this clause is No. 9. This lack of equality of bargaining power has long been recognized in our law; and stipulations for unreasonable exemption of the carrier have not been allowed to stand. Hence so definite a relinquishment of what the law gives the cargo as is found here can hardly be found reasonable without direct authorization of law." (Citations omitted.)

When one reads the statutory language in light of the policies behind COGSA's enactment, it is perfectly clear that a foreign forum selection or arbitration clause "relieves" or "lessens" the carrier's liability. The transaction costs associated with an arbitration in Japan will obviously exceed the potential recovery in a great many cargo disputes. As a practical matter, therefore, in such a case no matter how clear the carrier's formal legal liability may be, it would make no sense for the consignee or its subrogee to enforce that liability. It seems to me that a contractual provision that entirely protects the shipper from being held liable for anything should be construed either to have "lessened" its liability or to have "relieved" it of liability.

Even if the value of the shipper's claim is large enough to justify litigation in Asia,[12] contractual provisions that impose unnecessary and unreasonable costs on the consignee will inevitably lessen its net recovery. If, as under the Court's reasoning, such provisions do not affect the carrier's legal liability, it would appear to be permissible to require the consignee to pay the costs of the arbitration, or perhaps the travel expenses and fees of the expert witnesses, interpreters, and lawyers employed by both parties. Judge Friendly and the many other wise judges who shared his opinion were surely correct in concluding that Congress could not have intended such a perverse reading of the statutory text.

More is at stake here than the allocation of rights and duties between shippers and carriers. A bill of lading, besides being a contract of carriage, is a negotiable instrument that controls possession of the goods being shipped. Accordingly, the bill of lading can be sold, traded, or used to obtain credit as though the bill were the cargo itself. Disuniform-

---

[12] The majority's reasoning is not, of course, limited to foreign forums as accessible as Tokyo. A carrier who truly wished to relieve itself of liability might select an outpost in Antarctica as the setting for arbitration of all claims. Under the Court's reasoning, such a clause presumably would be enforceable.

ity in the interpretation of bills of lading will impair their negotiability. See *Union Ins. Soc. of Canton, Ltd.* v. *S. S. Elikon*, 642 F. 2d, at 723; G. Gilmore & C. Black, Law of Admiralty 146–147 (2d ed. 1975). Thus, if the security interests in some bills of lading are enforceable only through the courts of Japan, while others may be enforceable only in Liechtenstein, the negotiability of bills of lading will suffer from the uncertainty. COGSA recognizes that this negotiability depends in part upon the financial community's capacity to rely on the enforceability, in an accessible forum, of the bills' terms. Today's decision destroys that capacity.

The Court's reliance on its decision in *Carnival Cruise Lines, Inc.* v. *Shute*, 499 U. S. 585 (1991), is misplaced. That case held that a domestic forum selection clause in a passenger ticket was enforceable. As no carriage of goods was at issue, COGSA did not apply to the parties' dispute. Accordingly, the enforceability of the ticket's terms did not implicate the commercial interests in uniformity and negotiability that are served by the statutory regulation of bills of lading. Moreover, the *Carnival Cruise* holding is limited to the enforceability of *domestic* forum selection clauses. The Court in that case pointedly refused to respond to the concern expressed in my dissent that a wooden application of its reasoning might extend its holding to the selection of a forum outside of the United States. See *id.*, at 604. The wooden reasoning that the Court adopts today does make that extension, but it is surely not compelled by the holding in *Carnival Cruise*.[13]

---

[13] Nor is it compelled by logic. It is true that some domestic forums are more distant than some foreign forums—a citizen of Maine may have less trouble arbitrating in Canada than in Arizona. But that is no reason to eschew any distinction between foreign and domestic forums. If it is to adhere to *Carnival Cruise* and yet avoid an outrageous result, the Court must draw a line somewhere. The most sensible line, it seems to me, is at the United States border. Transaction costs generally, though not always, increase when that line is crossed. Passports usually must be obtained, language barriers often present themselves, and distances

Finally, I am simply baffled by the Court's implicit suggestion that our interpretation of the Harter Act (which preceded the Hague Rules), and the federal courts' consistent interpretation of COGSA since *Indussa* was decided in 1967, has somehow been unfaithful to our international commitments. See *ante*, at 536–539. The concerns about invalidating freely negotiated forum selection clauses that this Court expressed in *The Bremen* v. *Zapata Off-Shore Co.*, 407 U. S. 1 (1972), have no bearing on the validity of the provisions in bills of lading that are commonly recognized as contracts of adhesion. Our international obligations do not require us to enforce a contractual term that was not freely negotiated by the parties. Much less do they require us to ignore the clear meaning of COGSA—itself the product of international negotiations—which forbids enforcement of clauses lessening the carrier's liability. Indeed, discussing *The Bremen*'s impact on COGSA, Professor Black observed:

> "[I]t is hard to see how it can be looked on as other than a 'lessening' of the carrier's liability under COGSA to remit the bill of lading holder to a distant foreign court. It is quite true that the difficulty imposed would vary with circumstances; Canada is not Pakistan. But there is always some palpable 'lessening,' for if the choice-of-forum clause is ever enforced, the result must be to dismiss the litigant out of the United States court he has chosen to sue in. On most moderate-sized claims, remission to the foreign forum is a practical immunization of the carrier from liability." 6 Vand. J. Transnat'l L., at 368–369.

The majority points to several foreign statutes, passed by other signatories to the Hague Rules, that make foreign forum selection clauses unenforceable in the courts of those

---

are usually greater when litigants are forced to cross that boundary. I think *Carnival Cruise* was wrongly decided, but adherence to the holding in that case does not require the result the majority reaches today.

countries. See *ante*, at 537. The majority assumes (without citing any evidence) that these statutes were passed in order to depart from the Hague Rules, and that COGSA, our Nation's enactment of the Hague Rules, should therefore be read to mean something different from these statutes. I think the opposite conclusion is at least as plausible: These foreign nations believed nonenforcement of foreign forum selection clauses was consistent with their international obligations, and they passed these statutes to make that explicit. If anything, then, these statutes demonstrate that several foreign countries agree that the United States courts' consistent interpretation of COGSA does not contravene our mutual treaty obligations. Moreover, because Congress is presumed to know the law, *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–699 (1979), it has been justified in assuming, based on the courts' uniform interpretation of COGSA prior to today, that no specific statute such as Australia's or South Africa's was necessary to invalidate foreign forum selection and arbitration clauses. The existence of these foreign statutes, then, proves nothing at all.[14]

## III

Lurking in the background of the Court's decision today is another possible reason for holding, despite the clear meaning of COGSA and decades of precedent, that a foreign arbitration clause does not lessen liability. It may be that the Court does violence to COGSA in order to avoid a perceived conflict with another federal statute, the Federal Arbitration Act (FAA), 9 U. S. C. § 1 *et seq.* (1988 ed. and Supp. V). The FAA requires that courts enforce arbitration clauses in contracts—including those requiring arbitration in foreign coun-

---

[14] The majority's puzzling reference to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *ante*, at 538, strikes me as irrelevant. Nothing in that treaty even remotely suggests an intent to enforce arbitration clauses that constitute a "lessening" of liability under COGSA or the Hague Rules.

tries—the same way they would enforce any other contractual clause. See, *e. g., Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 478 (1989). This statute was designed to overturn the traditional common-law hostility to arbitration clauses. See *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S. 52, 55 (1995); *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U. S. 265, 270 (1995). According to the Court of Appeals, reading COGSA to invalidate foreign arbitration clauses would conflict directly with the terms and policy of the FAA.

Unfortunately, in adopting a contrary reading to avoid this conflict, the Court has today deprived COGSA § 3(8) of much of its force. The Court's narrow reading of "lessening [of] liability" excludes more than arbitration; it apparently covers only formal, legal liability. See *supra*, at 551–552. Although I agree with the Court that it is important to read potentially conflicting statutes so as to give effect to both wherever possible, I think the majority has ignored a much less damaging way to harmonize COGSA with the FAA.

Section 2 of the FAA reads:

> "A written provision in any maritime transaction . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. § 2.

This language plainly intends to place arbitration clauses upon the same footing as all other contractual clauses. Thus, like any clause, an arbitration clause is enforceable, "save upon such grounds" as would suffice to invalidate any other, nonarbitration clause. The FAA thereby fulfills its policy of jettisoning the prior regime of hostility to arbitration. Like any other contractual clause, then, an arbitration clause may be invalid without violating the FAA if, for exam-

ple, it is procured through fraud or forgery; there is mutual mistake or impossibility; the provision is unconscionable; or, as in this case, the terms of the clause are illegal under a separate federal statute which does not evidence a hostility to arbitration. Neither the terms nor the policies of the FAA would be thwarted if the Court were to hold today that a foreign arbitration clause in a bill of lading "lessens liability" under COGSA. COGSA does not single out arbitration clauses for disfavored treatment; it invalidates any clause that lessens the carrier's liability. Illegality under COGSA is therefore an independent ground "for the revocation of any contract," under FAA §2. There is no conflict between the two federal statutes.

The correctness of this construction becomes even more apparent when one considers the policies of the two statutes. COGSA seeks to ameliorate the inequality in bargaining power that comes from a particular form of adhesion contract. The FAA seeks to ensure enforcement of freely negotiated agreements to arbitrate. *Volt*, 489 U. S., at 478–479. As I have discussed, *supra*, at 543–544, 550, foreign arbitration clauses in bills of lading are not freely negotiated. COGSA's policy is thus directly served by making these clauses illegal; and the FAA's policy is not disserved thereby. In contrast, allowing such adhesionary clauses to stand serves the goals of neither statute.

## IV

The Court's decision in this case is an excellent example of overzealous formalism. By eschewing a commonsense reading of "lessening [of] liability," the Court has drained those words of much of their potency. The result compounds, rather than contains, the Court's unfortunate mistake in the *Carnival Cruise* case.

I respectfully dissent.