135 F.3d 1289
 Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495,
98 Cal. Daily Op. Serv. 907,
98 Daily Journal D.A.R. 1207
 Alan RICHARDS, et al., Plaintiffs-Appellants,
v.
LLOYD'S OF LONDON, an unincorporated association, et al.,
Defendants-Appellees.
John R. NORTON, III; Doris S. Norton; Diane B. Allison;
Charles G. Bentzin; F.M. Binkley; Delmar A. Brady; Samme
Jo Brady; George Maning Close; Russell M. Collins; Peter
Dwares; Robert Flesvig; Donald P. Gallop; Charles A.
Gerlach, Jr.; Robert W. Gerwig; Richard C. Henry; Michael
C. Hirsh; R. William Johnston; James H. Kayian; Joanne S.
Kayian-Olooney; Suzanne Kayian; Lowell Conrad Lundell;
Judith M. Ott; H.E. Rainbolt; David L. Rosenblatt; Ray
Morse Sanderson; Claire Tillman; Warren G. Vander Voort;
Peter Beck; Harold Franz Ilg; John C. Griffin; Ted
Kosloff; Francis J. Milon; Glen R. Mogan; Melanie M.
Norton; Joseph F. Weller, Plaintiffs-Appellants,
v.
LLOYD'S OF LONDON, an unincorporated association;
CORPORATION OF LLOYD'S, aka Society of Lloyd's,
aka The Society and Council of Lloyd's,
Defendants-Appellees.
 Nos. 95-55747, 95-56467.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 23, 1997.
Decided Feb. 3, 1998.
 
 Stephen A. Kroft, McDermott, Will & Emery, Los Angeles, California; Eugene I. Goldman, Robert E. Kohn, McDermott, Will & Emery, Washington, DC; Arlington Ray Robbins, Michael V. Pundeff, John H. Stephens, Robbins & Keehn, San Diego, California, for plaintiffs-appellants.
 Phillip K. Fife, Seal Beach, California, for plaintiff-appellant E. Pomeroy Williams.
 Harvey L. Pitt, Fried, Frank, Harris, Shriver & Jacobson, New York City; Dean Hansell, LeBoeuf, Lamb, Green & MacRae, Los Angeles, California; Taylor R. Briggs, Sheila H. Marshall, Mary L.B. Betts, Stephen H. Orel, LeBoeuf, Lamb, Greene & MacRae, New York City, for defendants-appellees The Corporation of Lloyd's, the Society of Lloyd's, and The Council of Lloyd's.
 Richard H. Walker, Jacob H. Stillman, Eric Summergrad, John W. Avery, Securities and Exchange Commission, Washington, DC, as amicus curiae.
 Eugene R. Anderson, Seth B. Schafler, Anderson Kill Olick & Oshinsky, New York City; Amy R. Bach, San Francisco, California, for amicus curiae United Policy holders.
 Leonard D. Venger, Ronald B. Turovsky, Donald R. Brown, Manatt, Phelps & Phillips, LLP, Los Angeles, California; William W. Palmer, California Department of Insurance, San Francisco, California, for amicus curiae California Commissioner of Insurance.
 Appeals from the United States District Court for the Southern District of California; Irma E. Gonzalez, District Judge, Presiding. D.C. Nos. CV-94-01211-IEG, CV-95-00952-IEG.
 Before: HUG, Chief Judge, GOODWIN, PREGERSON, KOZINSKI, TROTT, FERNANDEZ, RYMER, KLEINFELD, HAWKINS, TASHIMA, and THOMAS, Circuit Judges.
 Opinion by Judge Goodwin; Dissent by Judge Thomas.
 GOODWIN, Circuit Judge:
 
 
 1
 The primary question this case presents is whether the antiwaiver provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 void choice of law and choice of forum clauses in an international transaction. The district court found that they do not. The appeal has been argued twice. Upon reconsideration en banc, the opinion published at 107 F.3d 1422 (9th Cir.1997) is withdrawn and we affirm the district court.
 
 Background
 
 2
 Appellants, all citizens or residents of the United States, are more than 600 "Names" who entered into underwriting agreements. The Names sued four defendants: the Corporation of Lloyd's, the Society of Lloyd's, the Council of Lloyd's, (collectively, "Lloyd's") and Lloyd's of London, (the "unincorporated association").
 
 
 3
 Lloyd's is a market in which more than three hundred Underwriting Agencies compete for underwriting business. Pursuant to the Lloyd's Act of 1871-1982, Lloyd's oversees and regulates the competition for underwriting business in the Lloyd's market. The market does not accept premiums or insure risks. Rather, Underwriting Agencies, or syndicates, compete for the insurance business. Each Underwriting Agency is controlled by a Managing Agent who is responsible for the financial status of its agency. The Managing Agent must attract not only underwriting business from brokers but also the capital with which to insure the risks underwritten.
 
 
 4
 The Names provide the underwriting capital. The Names become Members of the Society of Lloyd's through a series of agreements, proof of financial means, and the deposit of an irrevocable letter of credit in favor of Lloyd's. To become a Name, one must travel to England to acknowledge the attendant risks of participating in a syndicate and sign a General Undertaking. The General Undertaking is a two page document containing choice of forum and choice of law clauses (collectively the "choice clauses"), which form the basis for this dispute. The choice clauses read:
 
 
 5
 2.1 The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking shall be governed by and construed in accordance with the laws of England.
 
 
 6
 2.2 Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's....
 
 
 7
 By becoming a Member, the Names obtain the right to participate in the Lloyd's Underwriting Agencies. The Names, however, do not deal directly with Lloyd's or with the Managing Agents. Instead, the Names are represented by Members' Agents who, pursuant to agreement, stand in a fiduciary relationship with their Names. Upon becoming a Name, an individual selects the syndicates in which he wishes to participate. In making this decision, the individual must rely to a great extent on the advice of his Members' Agent. The Names generally join more than one underwriting agency in order to spread their risks across different types of insurance. When a Name undertakes an underwriting obligation, that Name is responsible only for his share of an agency's losses; however, his liability is unlimited for that share.
 
 
 8
 In this case, the risk of heavy losses has materialized and the Names now seek shelter under United States securities laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The Names claim that Lloyd's actively sought the investment of United States residents to fill an urgent need to build up capital. According to the Names, Lloyd's concealed information regarding the possible consequences of the risks undertaken and deliberately and disproportionately exposed the Names to massive liabilities for which sufficient underwriting capital or reinsurance was unavailable.
 
 
 9
 This appeal does not address the merits of the underlying claims. It addresses only the Names' contention that their disputes with Lloyd's should be litigated in the United States despite contract clauses binding the parties to proceed in England under English law. It also addresses whether default should have been entered against the unincorporated association.
 
 Standard of Review
 
 10
 We review the district court's decision to enforce the choice clauses for abuse of discretion. Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 323 (9th Cir.1996). As we are reviewing a Rule 12(b)(3) motion decision, we need not accept the pleadings as true. Id. at 324.
 
 
 11
 Whether the securities laws void the choice clauses is a question of law that we review de novo. Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1300 (9th Cir.1997).
 
 Discussion
 
 12
 The Names make three arguments for repudiating the choice clauses. They contend (1) that the antiwaiver provisions of the federal securities laws void such clauses, (2) that the choice clauses are invalid because they offend the strong public policy of preserving an investor's remedies under federal and state securities law and RICO and (3) that the choice clauses were obtained by fraud. We will address each of these in turn.
 
 
 13
 * We analyze the validity of the choice clause under The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), where the Supreme Court stated that courts should enforce choice of law and choice of forum clauses in cases of "freely negotiated private international agreement[s]." Bremen, 407 U.S. at 12-13, 92 S.Ct. at 1914.[1]
 
 
 14
 * The Names dispute the application of Bremen to this case. They contend that Bremen does not apply to cases where Congress has spoken directly to the immediate issue--as they claim the antiwaiver provisions do here.
 
 
 15
 The Securities Act of 1933 (the " '33 Act") provides that:
 
 
 16
 Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.
 
 
 17
 15 U.S.C. § 77n. The 1934 Securities Exchange Act (the " '34 Act") contains a substantially similar provision. 15 U.S.C. § 78cc(a). The Names seize on these provisions and claim that they void the choice clauses in their agreement with Lloyd's.
 
 
 18
 Certainly the antiwaiver provisions are worded broadly enough to reach this case. They cover "any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter...." Indeed, this language is broad enough to reach any offer or sale of anything that could be alleged to be a security, no matter where the transaction occurs.
 
 
 19
 Nevertheless, this attempt to distinguish Bremen fails. In Bremen itself, the Supreme Court contemplated that a forum selection clause may conflict with relevant statutes. Bremen, 407 U.S. at 15, 92 S.Ct. at 1916 ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision.") (emphasis added).
 
 
 20
 Moreover, in Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), the Supreme Court explicitly relied on Bremen in a case involving a securities transaction.[2] Echoing the language of Bremen, the Court found that "[a] contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is ... an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." Id. at 516, 94 S.Ct. at 2455. See Bremen, 407 U.S. at 13-14, 92 S.Ct. at 1914-16 ("[A]greeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting."). This passage should leave little doubt as to the applicability of Bremen to the case at hand.[3]
 
 
 21
 Indeed, were we to find that Bremen did not apply, the reach of United States securities laws would be unbounded. The Names simply prove too much when they assert that "Bremen 's judicially-created policy analysis under federal common law is not controlling when Congress has expressed its will in a statute." This assertion, if true, expands the reach of federal securities law to any and all such transactions, no matter how remote from the United States. We agree with the Fifth Circuit that "we must tread cautiously before expanding the operation of U.S. securities law in the international arena." Haynsworth v. The Corporation, 121 F.3d 956, 966 (5th Cir.1997).
 
 B
 
 22
 Having determined that Bremen governs international contracts specifying forum and applicable law, we turn to the question whether the contract between Lloyd's and the Names is international. Not surprisingly, the Names contend that these were purely domestic securities sales. They claim that Lloyd's solicited the Names in the United States and that the trip the Names made to England was a mere ritual without legal significance.
 
 
 23
 We disagree. The Names signed a contract with English entities to participate in an English insurance market and flew to England to consummate the transaction. That the Names received solicitations in the United States does not somehow erase these facts. Moreover, Lloyd's insistence that individuals travel to England to become a Name does not strike us as mere ritual. Lloyd's likely requires this precisely so that those who choose to be the Names understand that English law governs the transaction. Entering into the Lloyd's market in the manner described is plainly an international transaction.
 
 II
 
 24
 We now apply Bremen to this case. Bremen emphasized that "in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside." Bremen, 407 U.S. at 15, 92 S.Ct. at 1916. The Court reasoned that "[t]he elimination of all [ ] uncertainties [regarding the forum] by agreeing in advance ... is an indispensable element in international trade, commerce, and contracting." Id. at 13-14, 92 S.Ct. at 1915. Thus, "absent some compelling and countervailing reason [a forum selection clause] should be honored by the parties and enforced by the courts." Id. at 12, 92 S.Ct. at 1914. The party seeking to avoid the forum selection clause bears "a heavy burden of proof." Id. at 17, 92 S.Ct. at 1917.
 
 
 25
 The Supreme Court has identified three grounds for repudiating a forum selection clause: first, if the inclusion of the clause in the agreement was the product of fraud or overreaching; second, if the party wishing to repudiate the clause would effectively be deprived of his day in court were the clause enforced; and third, "if enforcement would contravene a strong public policy of the forum in which suit is brought." Id. at 12-13, 15, 18, 92 S.Ct. at 1914-18. The Names contend that the first and third grounds apply in this case.
 
 
 26
 * The Names' strongest argument for escaping their agreement to litigate their claims in England is that the choice clauses contravene a strong public policy embodied in federal and state securities law and RICO. See Bonny v. Society of Lloyd's, 3 F.3d 156, 160-61 (7th Cir.1993) (expressing "serious concerns" that the choice clauses offend public policy but ultimately ruling in Lloyd's favor), cert. denied, 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1364-66 (2nd Cir.) (substantially the same), cert. denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993).
 
 
 27
 We follow our six sister circuits that have ruled to enforce the choice clauses. See Haynsworth, 121 F.3d 956; Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir.1996); Shell v. R.W. Sturge, Ltd., 55 F.3d 1227 (6th Cir.1995); Bonny, 3 F.3d 156; Roby, 996 F.2d 1353; and Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953 (10th Cir.), cert. denied, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992). We do so because we apply Scherk and because English law provides the Names with sufficient protection.
 
 
 28
 In Scherk, the Supreme Court was confronted with a contract that specified that all disputes would be resolved in arbitration before the International Chamber of Commerce in Paris, France. Scherk, 417 U.S. at 508, 94 S.Ct. at 2451-52. The arbitrator was to apply the law of the state of Illinois. Id. The Court enforced the forum selection clause despite then hostile precedent.[4] Id. at 52021, 94 S.Ct. at 2457-58. See Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), overruled by Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 485, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989).
 
 
 29
 The Court's treatment of Wilko leaves little doubt that the choice clauses in this case are enforceable. In Wilko, the Supreme Court ruled that "the right to select the judicial forum is the kind of 'provision' that cannot be waived under § 14 of the Securities Act." Wilko, 346 U.S. at 435, 74 S.Ct. at 186. In Scherk, the Court had before it a case where both the District Court and the Seventh Circuit found a forum selection clause invalid on the strength of Wilko. Scherk, 417 U.S. at 510, 94 S.Ct. at 2452-53.
 
 
 30
 In distinguishing Wilko, the Supreme Court stated that there were "significant and, we find, crucial differences between the agreement involved in Wilko and the one signed by the parties here." Scherk, 417 U.S. at 515, 94 S.Ct. at 2455. The first and primary difference that the Court relied upon was that "Alberto-Culver's contract ... was a truly international agreement." Id. The Court reasoned that such a contract needs, as "an almost indispensable precondition," a "provision specifying in advance the forum in which disputes shall be litigated and the law to be applied." Id. at 516, 94 S.Ct. at 2455 (emphasis added).
 
 
 31
 Moreover, the Supreme Court has explained that, in the context of an international agreement, there is "no basis for a judgment that only United States laws and United States courts should determine this controversy in the face of a solemn agreement between the parties that such controversies be resolved elsewhere." Id. at 517 n. 11, 94 S.Ct. at 2456 n. 11. To require that " 'American standards of fairness' must ... govern the controversy demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries." Id.
 
 
 32
 These passages from Scherk, we think, resolve the question whether public policy reasons allow the Names to escape their "solemn agreement" to adjudicate their claims in England under English law. Scherk involved a securities transaction. Id. at 514 n. 8, 94 S.Ct. at 2455 n. 8. The Court rejected Wilko 's holding that the antiwaiver provision of the '34 Act prohibited choice clauses. Id. at 515-16, 94 S.Ct. at 2455-56. It also recognized that enforcing the forum selection clause would, in some cases, have the same effect as choosing foreign law to apply. Id. at 516, 517 n. 11, 94 S.Ct. at 2455, 2456 n. 11. Yet the Court did not hesitate to enforce the forum selection clauses. It believed that to rule otherwise would "reflect a 'parochial concept that all disputes must be resolved under our laws and in our courts.' " Id. at 519, 94 S.Ct. at 2457 (quoting Bremen, 407 U.S. at 9, 92 S.Ct. at 1912). As the Supreme Court has explained, " '[w]e cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.' " Id. (quoting Bremen, 407 U.S. at 9, 92 S.Ct. at 1912).
 
 
 33
 Relying on Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 634, 105 S.Ct. 3346, 3357-58, 87 L.Ed.2d 444 (1985), the Names argue that federal and state securities laws are of "fundamental importance to American democratic capitalism." They claim that enforcement of the choice clauses will deprive them of important remedies provided by our securities laws. The Supreme Court disapproved of such an outcome, the Names contend, when it stated that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." Id. at 637 n. 19, 105 S.Ct. at 3359 n. 19.
 
 
 34
 Without question this case would be easier to decide if this footnote in Mitsubishi had not been inserted. Nevertheless, we do not believe dictum in a footnote regarding antitrust law outweighs the extended discussion and holding in Scherk on the validity of clauses specifying the forum and applicable law. The Supreme Court repeatedly recognized in Scherk that parties to an international securities transaction may choose law other than that of the United States, Scherk, 417 at 516, 517 n. 11, 519 n. 13, 2455-56, 2456, 2457 n. 13, yet it never suggested that this affected the validity of a forum selection clause. See also Bremen, 407 U.S. at 13 n. 15, 92 S.Ct. at 1915 n. 15 (recognizing that a forum selection clause also acts to select applicable law); Milanovich v. Costa Crociere, S.p.A., 954 F.2d 763, 767 n. 7 (D.C.Cir.1992) ("The Bremen involved a choice-of-forum clause, but the Supreme Court recognized that enforcing the provision would have the effect of subjecting the contract to foreign law.").[5]
 
 B
 
 35
 Of course, were English law so deficient that the Names would be deprived of any reasonable recourse, we would have to subject the choice clauses to another level of scrutiny. See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991) ("It bears emphasis that forum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness."). In this case, however, there is no such danger. See Haynsworth, 121 F.3d at 969 ("English law provides a variety of protections for fraud and misrepresentations in securities transactions."). Cf. British Midland Airways Ltd. v. International Travel, Inc., 497 F.2d 869, 871 (9th Cir.1974) (This court is "hardly in a position to call the Queen's Bench a kangaroo court.").
 
 
 36
 We disagree with the dramatic assertion that "[t]he available English remedies are not adequate substitutes for the firm shields and finely honed swords provided by American securities law." Richards v. Lloyd's of London, 107 F.3d 1422, 1430 (9th Cir.1997). The Names have recourse against both the Member and Managing Agents for fraud, breach of fiduciary duty, or negligent misrepresentation. Indeed, English courts have already awarded substantial judgments to some of the other Names. See Arubuthnott v. Fagan and Feltrim Underwritings Agencies Ltd., 3 Re LR 145 (H.L.1994); Deeny v. Gooda Walker Ltd., Queen's Bench Division (Commercial Court), The Times 7 October 1994.[6]
 
 
 37
 While it is true that the Lloyd's Act immunizes Lloyd's from many actions possible under our securities laws, Lloyd's is not immune from the consequences of actions committed in bad faith, including fraud. Lloyd's Act of 1982, Ch. 14(3)(e)(i). The Names contend that entities using the Lloyd's trade name willfully and fraudulently concealed massive long tail liabilities in order to induce them to join syndicates. If so, we have been cited to no authority that Lloyd's partial immunity would bar recovery.
 
 C
 
 38
 The addition of RICO claims does not alter our conclusion. This court has already held that the loss of RICO claims does not suffice to bar dismissal for forum non conveniens. Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 768-69 (9th Cir.1991). We agree with our sister circuit that has considered this issue and extend the logic of Lockman to this case. Roby, 996 F.2d at 1366.
 
 D
 
 39
 The Names also argue that the choice clauses were the product of fraud. They claim that at the time of signing the General Undertaking, Lloyd's knew that the Names were effectively sacrificing valid claims under U.S. law by signing the choice clauses and concealed this fact from the Names. Had the Names known this fact, they contend, they never would have agreed to the choice clauses. The Names never allege, however, that Lloyd's misled them as to the legal effect of the choice clauses. Nor do they allege that Lloyd's fraudulently inserted the clauses without their knowledge. Accordingly, we view the allegations made by the Names as going only to the contract as a whole, with no allegations as to the inclusion of the choice clauses themselves.
 
 
 40
 Absent such allegations, these claims of fraud fail. The Supreme Court has noted that simply alleging that one was duped into signing the contract is not enough. Scherk, 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14 (The fraud exception in Bremen "does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud ... the clause is unenforceable."). For a party to escape a forum selection clause on the grounds of fraud, it must show that "the inclusion of that clause in the contract was the product of fraud or coercion." Id. (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)) (emphasis in original). See also Prima Paint, 388 U.S. at 404, 87 S.Ct. at 1806 ("[T]he statutory language [of the United States Arbitration Act] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.").
 
 E
 
 41
 The Names object that Moseley v. Electronic & Missile Facilities, Inc., 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963), requires the district court to adjudicate the claims of fraud before dismissal. In Moseley, the Supreme Court found that "it seems clear that the issue of fraud should first be adjudicated before the rights of the parties under the [contracts] can be determined." Id. at 171, 83 S.Ct. at 1817-18. Taken out of context, this statement would seem to support the Names' position.
 
 
 42
 When viewed in context, however, it becomes clear that this statement in fact provides no aid to the Names. The Supreme Court required an initial adjudication of the fraud claim after noting that "no request has been made here for the enforcement of the arbitration agreement included within the [contracts.]" Id. at 170, 83 S.Ct. at 1817. It was only "[w]ith the pleadings in this posture" that the Supreme Court required a trial on the fraud claims. Id. at 171, 83 S.Ct. at 1817. Here Lloyd's has clearly and vigorously called for the enforcement of the choice clauses. Accordingly, Moseley does not apply to the instant case and the Names are not entitled to a trial on their claims of fraud.
 
 III
 
 43
 Because we decide that the district court correctly ruled to enforce the choice clauses, the request to enter default against the unincorporated association is moot.
 
 
 44
 AFFIRMED.
 
 
 45
 THOMAS, Circuit Judge, with whom Judge PREGERSON and Judge HAWKINS join, dissenting.
 
 
 46
 The majority espouses a reasonable foreign policy, but one which emanates from the wrong branch of government. Congress has already explicitly resolved the question at hand. In the Securities Act of 1933 and the Securities Exchange Act of 1934 (the "Acts"), Congress expressly provided that investors cannot contractually agree to disregard United States securities law. Thus, in applying the "reasonableness" policy-weighing approach of M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the majority displaces Congress' specific statutory directive. Furthermore, even assuming that the Bremen analysis applies here, the circumstances surrounding this dispute compel the conclusion that enforcement of the choice clauses would be unreasonable. Accordingly, I respectfully dissent.
 
 I.
 
 47
 Unlike the conflict the Bremen Court envisioned between statutes and forum selection clauses, the Acts do not merely declare "a strong public policy" against the waiver of compliance with United States securities laws. Rather, the Acts explicitly and unconditionally prohibit such a waiver. The language of the Securites Act of 1933 is clear and unambiguous:
 
 
 48
 Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.
 
 
 49
 15 U.S.C. § 77n. The Securities Exchange Act of 1934 contains a similar restriction. See 15 U.S.C. § 78cc(a).
 
 
 50
 Absent these antiwaiver provisions, courts could appropriately examine choice-of-forum clauses in investment contracts under a Bremen analysis to determine whether they violated the strong public policy of the United States as embodied in our securities law. However, the Acts' antiwaiver provisions decisively alter this inquiry. With adoption of those sections, Congress announced a per se rule that American laws cannot be ignored in this context. Courts should not employ amorphous public policy to emasculate plain statutory language. "Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy." United States v. Rutherford, 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). Rather, "[o]nly when a literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributed to congressional design will an exception to statutory language be judicially implied." Id. Because Congress quite reasonably intended that our securities laws be enforced even when a salesperson managed to obtain an investor's waiver, we "have no license to depart from the plain language" of the Acts. Id.
 
 
 51
 The majority turns this analysis inside out, by holding that underlying antiwaiver public policy eviscerates specific antiwaiver statutory provisions. Disregarding this express prohibition to assess whether enforcement of the choice clauses contravenes the underlying policy against waiver is akin to overlooking the plain language of a statute to consider its legislative history, a clearly disfavored method of statutory interpretation. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149-50, 117 L.Ed.2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.... When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.... It would be dangerous in the extreme to infer ... that a case for which the words of an instrument expressly provide, shall be exempted from its operation.") (citations and internal quotation marks omitted). As the majority concedes, the explicit language of the Acts bars the waiver that the choice clauses would effectuate here. Thus, the "unadorned words" of the Acts' antiwaiver provisions should not be limited by the antiwaiver public policy they impliedly express, see Germain, 503 U.S. at 254, 112 S.Ct. at 1149-50.
 
 
 52
 The majority's fears notwithstanding, it is unnecessary to displace Congress' reasoned judgment in order to contract the "boundless" reach of United States securities laws. First, because plaintiffs alleging securities fraud will at some point have to establish that the disputed transactions involved "securities," as defined under United States law, plaintiffs cannot gain unfettered access to the protection of the securities laws simply by alleging that they have purchased securities. Second, the plaintiffs here do not seek to invoke the Acts' substantive remedies in the context of transactions that enjoy only an incidental nexus with the United States. Lloyd's recruited the plaintiffs, residents of the United States, in the United States, often using United States brokerage firms and recruiters, and availed itself of the United States mails to disseminate information about becoming a Name. In short, Lloyd's purposefully devoted considerable time and resources to recruiting American investors through specifically American media. To penalize the plaintiffs in this case based upon a hypothetical scenario that differs dramatically from the circumstances at issue here would work an unjust deprivation of the plaintiffs' rights under the Acts.
 
 
 53
 The majority argues that the Supreme Court's reliance on Bremen in Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), should control here. However, the majority overlooks the crucial differences between the instant dispute and the facts underlying Scherk. Scherk involved a contract that contained an agreement to arbitrate any disputes arising out of the contract in Paris, France. This contract specified that "[t]he laws of the State of Illinois, U.S.A. shall apply to and govern this agreement, its interpretation and performance." Scherk, 417 U.S. at 508, 94 S.Ct. at 2451-52. In contrast, the choice clauses here not only select the forum--the courts of England--but mandate that English law shall govern any controversy. Thus, the reasoning and conclusions of Scherk should not extend to this case. To the extent that the Scherk Court approved a hypothetical choice-of-law clause that prescribed the application of foreign law, such approval was dicta and cannot bind the parties here.
 
 
 54
 Furthermore, the Lloyd's underwriting agreements had substantial connections with the United States, in contrast with the sparse contacts between the United States and the contract in Scherk. In Scherk, an American company made an initial contact with Scherk, a German citizen, in Germany, pursued negotiations with Scherk in both Europe and the United States, and finally executed a contract in Vienna, Austria, providing for the transfer of the ownership of Scherk's enterprises. The closing of this transaction occurred in Geneva, Switzerland. In comparison, the sole component of Lloyd's campaign to recruit American Names that took place in England was the committee meeting that new Names attended in London. Otherwise, every aspect of the solicitation occurred in the United States. To characterize this extensive and multifaceted recruitment campaign as the mere receipt of "solicitations," as does the majority, is to understate the impact of Lloyd's activities in the United States.
 
 
 55
 The Scherk majority itself recognized that a contract with "insignificant or attenuated" contacts with foreign countries might well prompt a refusal to enforce a forum selection clause, let alone a clause choosing foreign law. Scherk, 417 U.S. at 517 n. 11, 94 S.Ct. at 2456 n. 11. The Court observed: "Judicial response to such situations can and should await future litigation in concrete cases." Id. The instant case offers just such a concrete opportunity to assess the enforceability of the choice clauses independently of the Scherk methodology and holding--an opportunity this court should use to effectuate Congress' explicit statutory directive.
 
 
 56
 Unfortunately, the majority has chosen to contravene an unequivocal Congressional mandate, founded on an interpretation of underlying public policy. However reasonable that policy, it cannot supplant clear, unambiguous statutory language.
 
 II.
 
 57
 In addition to violating the Acts' express antiwaiver provisions, the choice clauses are unenforceable because they are " 'unreasonable' under the circumstances." Bremen, 407 U.S. at 10, 92 S.Ct. at 1913. Initially, the Supreme Court has twice stated that the type of clauses at issue here are invalid when they prospectively disable parties from pursuing statutory remedies. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 3359 n. 19, 87 L.Ed.2d 444 (1985), quoted in Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540, 115 S.Ct. 2322, 2329-30, 132 L.Ed.2d 462 (1995). Indeed, in Vimar, the Court went so far as to declare that "[t]he relevant question" was "whether the substantive law to be applied [would] reduce the carrier's obligations to the cargo owner below what [the Carriage of Goods by Sea Act] requires." Vimar, 515 U.S. at 539, 115 S.Ct. at 2329. In other words, the Court implicitly rejected the argument that a forum selection clause must be enforced even if some of the claims that could have been brought in the forum of the lawsuit must be forfeited.
 
 
 58
 As applied here, the logic of Mitsubishi and Vimar militates against enforcing the choice clauses. Not only do the choice clauses preclude the plaintiffs from seeking the substantive remedies the Acts offer, but the protections they provide under English law are markedly inferior to the Acts'. For instance, English law recognizes no remedy for the failure to register securities as required by section 12(1) of the Securities Act of 1933. Nor is there any English remedy against Lloyd's for negligent misrepresentation as provided by section 12(2) of the Securities Act of 1933, because the 1982 Lloyd's Act expressly immunizes Lloyd's from any claim for "negligence or other tort" unless bad faith was involved.[1] Third, no "controlling person" liability exists in England, whereas section 15 of the Securities Act of 1933 and section 20(a) of the 1934 Securities Exchange Act impose such liability. Thus, the choice clauses should not be enforced, because they afford a level of protection far lower than the remedies the Acts provide.
 
 
 59
 The stark differences between American and English securities laws in turn reveal additional public policy reasons for invalidating the choice clauses. Enforcing the choice clauses gravely disadvantages American businesses, because foreign businesses, like Lloyd's, can recruit investors without expending the time and money involved in fulfilling the requirements of the Acts--a burden that American businesses cannot legally evade. Invalidating the choice clauses therefore eliminates any artificial advantage that Lloyd's may have enjoyed in competing in the American insurance market. In addition, the Acts furnish a necessary regulatory check upon an otherwise virtually autonomous organization. As the British government itself concedes, Lloyd's is a self-governing body charged with regulatory functions. Hence, a refusal to enforce the choice clauses would not reflect a lack of deference to English law and courts, but would simply arise from the realization that externally imposed restraints may sometimes be appropriate to control the behavior of a self-regulating organization.
 
 
 60
 The majority rejects the applicability of Mitsubishi and Vimar to the choice clauses on two bases. First, the majority assails footnote 19 in Mitsubishi as mere dictum which cannot "outweig[h] the extended discussion and holding in Scherk on the validity of clauses specifying the forum and applicable law." Second, the majority objects to the extension of Vimar to the instant case, because Vimar involved the Carriage of Goods by Sea Act ("COGSA"), a statute attempting to ensure uniformity in international transactions.
 
 
 61
 This reasoning stands on tenuous ground. Initially, while footnote 19 in Mitsubishi was not incorporated into the Court's actual holding, the Court left no doubt about its position on this issue by reiterating it in the entirely different setting of Vimar. Hence, the Court implicitly indicated that its concerns about a potential deprivation of plaintiffs' access to statutory remedies were limited to neither the antitrust nor the COGSA context. Moreover, as explained above, to the extent that the Scherk Court speculated about the enforceability of a contractual provision selecting foreign law, such a discussion was dictum. As such, it warrants no greater deference than footnote 19 of Mitsubishi.
 
 
 62
 Finally, the majority errs in characterizing the Acts as purely domestic, as opposed to the internationally-oriented COGSA. Congress intended the Securities Act of 1933 to bring the United States into line with the protections other nations gave the security-buying public, by protecting American investors against fraud and misrepresentation in the sale of securities in interstate and foreign commerce alike. In fact, Congress observed that the necessity for such legislation arose from "the fact that billions of dollars [had] been invested in practically worthless securities, both foreign and domestic, including those of foreign governments, by the American public through incomplete, careless, or false representations." The consequence, Congress concluded, was "dire national distress." S.Rep. No. 47, at 2 (1933). Not only does this legislative history establish the international, as well as domestic, perspective of the Securities Act of 1933, but it drives home the necessity for invalidating the choice clauses here. Allegations of Lloyd's "incomplete, careless, or false representations" about the plaintiffs' participation in the English insurance market are precisely the issue in this case. Most importantly, given the hundreds of millions of dollars that American Names have invested in Lloyd's underwriting agreements, the "dire national distress" that originally prompted Congress to adopt securities regulation legislation may well make an unwanted reappearance.III.
 
 
 63
 Increasing access to international capital markets is a laudable goal, but one need not trample on United States securities laws to achieve it. Indeed, securitization of insurance risk is increasing, with some public offerings involving Lloyd's exposures. However, these insurance risk-backed securitized investments are marketed in conformance with securities law, with full disclosure to the investor. Indeed, the facts alleged in this case make a powerful argument for vigorous application of American securities laws. A company, whether foreign or domestic, should not be able to mislead American investors with impunity into assuming unlimited liability for known losses with no possibility of financial gain.
 
 
 64
 When Congress voided waiver clauses, it meant what it said. The antiwaiver provisions of the Acts, whether as clear statutory directives or as embodiments of public policy, render the choice clauses unenforceable. The district court's dismissal of the plaintiffs' claims under the Acts should be reversed. Hence, I respectfully dissent.
 
 
 
 [1]
 While the contract in Bremen did not contain a choice of law clause, the Supreme Court explicitly recognized that the forum selection clause also acted as a choice of law clause. Id. at 13 n. 15, 92 S.Ct. at 1915 n. 15 ("[W]hile the contract here did not specifically provide that the substantive law of England should be applied, it is the general rule in English courts that the parties are assumed, absent a contrary indication, to have designated the forum with the view that it should apply its own law.... It is therefore reasonable to conclude that the forum clause was also an effort to obtain certainty as to the applicable substantive law.")
 
 
 [2]
 In Scherk the Supreme Court assumed without so ruling that the transaction involved securities. Scherk, 417 U.S. at 514 n. 8, 94 S.Ct. at 2455 n. 8. Because it is not altogether clear whether the investments here were securities, we too assume without deciding that the Names invested in securities
 
 
 [3]
 The Names also cite Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) in support of their position. Stewart does not aid the Names. It is true that Stewart held that before engaging in a Bremen analysis, "the first question [is] whether [28 U.S.C.] § 1404(a) itself controls respondent's request to give effect to the parties' contractual choice of venue." Stewart, 487 U.S. at 29, 108 S.Ct. at 2243-44. That case, however, involved a federal court sitting in diversity confronted with a purely domestic transaction. Thus it does not address this situation
 
 
 [4]
 The Court recognized that an agreement to arbitrate "is, in effect, a specialized kind of forum-selection clause." Scherk, 417 U.S. at 519, 94 S.Ct. at 2457
 
 
 [5]
 The Names also point to Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995), as support for their position. In Vimar, the Supreme Court expressed concern that a forum selection clause combined with a choice of law clause would deprive a party of remedies under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 et seq. Id. at 539, 115 S.Ct. at 2329. The Court's reasoning in Vimar, however, does not extend to the instant case as Vimar involved COGSA, a statute designed to address international transactions. Id. at 537, 115 S.Ct. at 2328 ("COGSA is the culmination of a multilateral effort to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade.") (internal quotations and citation omitted)
 
 
 [6]
 The Names complain that the Member and Managing Agents are insolvent. If so, this is truly unfortunate. It does not, however, affect our analysis of the adequacy of English law
 
 
 [1]
 While the plaintiffs may sue Members' and Managing Agents, who are not exempt from the 1982 Lloyd's Act, the Members' and Managing Agents are insolvent. The majority regards this insolvency, if true, as "truly unfortunate," but deems it irrelevant to the "analysis of the adequacy of English law." See supra note 6. However, it is equally reasonable to find English law all the more inadequate to address the plaintiffs' grievances, because the insolvency of one class of potential defendants so materially damages the plaintiffs' chances for recovery