THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| DEKRYPT CAPITAL, LLC, a Delaware company, DEKRYPT MASTER FUND L.P., a British Virgin Islands company, DEKRYPT VENTURES I L.P., a British Virgin Islands company, ARRINGTON XRP CAPITAL CAYMAN SPV, LTD., a Cayman Islands company, and ARRINGTON CAPITAL MANAGEMENT, LLC, a Washington Company, | No. 82606-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

Respondents,

v.

UPHOLD LTD., a Cayman Islands exempted limited liability company, UPHOLD, INC., a Washington corporation, UPHOLD HQ INC., a South Carolina corporation, JUAN PABLO THIERIOT, individually and the marital community comprised thereof, and DANIEL SCHATT, individually and the marital community comprised thereof,

Appellants.

ANDRUS, A.C.J. — Uphold Ltd., two affiliated companies, Juan Pablo Thieriot, Uphold's chief executive officer, and Daniel Schatt, a member of Uphold's board (collectively Uphold), appeal a trial court order denying their motion to compel arbitration of claims asserted by five companies who contracted with

Citations and pin cites are based on the Westlaw online version of the cited material.

Uphold to purchase units of cryptocurrency (the Buyers). We conclude the arbitrability of the Buyers' claims is governed by the Federal Arbitration Act (FAA),[1] and that under this federal statute, we refer to state law to interpret the agreement to decide who may compel arbitration. We further conclude there is no conflict between Singapore law, the choice of law of the contract, and Washington law, and that under both jurisdictions, Uphold has the right to compel arbitration of the Buyers' claims. We therefore reverse and remand for the entry of an order compelling arbitration.

<u>FACTUAL BACKGROUND</u>

In November 2020, five companies—Dekrypt Capital LLC, Dekrypt Master Fund L.P., Dekrypt Ventures L.P. (the Dekrypt Companies), Arrington XRP Capital Cayman SPV, Ltd., and Arrington Capital Management LLC (the Arrington Companies)—initiated a lawsuit against Uphold.[2] The lawsuit alleges that Uphold represented that it intended to universalize the process of trading cryptocurrencies by building a "Universal Protocol Platform, a digital reserve ecosystem that provides interoperability for blockchain-based assets," and was raising money for the project through the sale of cryptocurrency tokens. It further alleges that the Dekrypt Companies and the Arrington Companies entered into "Token Sale Agreements" (TSAs) with Uphold for the purchase of these tokens, that the tokens were "securities" under the Washington State Securities Act (WSSA), chapter 21.20 RCW, and that Uphold violated the WSSA by selling unregistered securities

---

[1] 9 U.S.C. §§ 1-14.
[2] According to the complaint, Uphold, Inc. and Uphold HQ, Inc. are subsidiaries of Uphold, Ltd. Juan Pablo Thieriot is the chief executive officer of all three Uphold companies. Daniel Schatt was a board member of Uphold HQ.

and making materially false representations in the sales. These Buyers seek to rescind the TSAs and to recover damages for violations of the WSSA and for negligent misrepresentations.

The Buyers' claims arise out of three separate, but identical TSAs. Each TSA provided:

THIS TOKEN SALE AGREEMENT is entered into . . . by and between:

1. THE VENDOR (AS DEFINED HEREIN); and
2. THE PERSON/CORPORATION WHOSE PARTICULARS ARE SET OUT IN SCHEDULE 1 (the "Buyer"),

in connection with the intended distribution by the Vendor of certain cryptographic tokens known as "Universal Protocol Tokens" . . . in furtherance of the establishment and launch of the "Universal Protocol" project (the "Project"), which is being jointly developed by a coalition of cryptocurrency companies and blockchain pioneers known as the Universal Protocol Alliance (the "Project Group"). . . .[3]

On August 3, 2018, Uphold executed the first TSA with the Arrington Companies. The TSA recitals stated that the "Parties" to the agreement were "the Buyer" and "the Vendor." The "Buyer" was identified as Arrington XRP (AXRP). In Schedule 1 to the TSA, AXRP agreed to transfer $2 million to Uphold and, in exchange, Uphold promised to transfer 250,000,000 digital tokens to AXRP at a price of $0.008 per token.

On September 4, 2018, Uphold executed a TSA with two Dekrypt Companies. The TSA identified the "Buyer" as Dekrypt Master Fund L.P. Dekrypt Capital LLC, the general partner of Dekrypt Master Fund, executed the agreement on behalf of the limited partnership. The Dekrypt Companies agreed to transfer

---

[3] The TSAs do not identify the specific companies in this Project Group but the parties appear to agree that Uphold's subsidiaries fall within this group.

$1 million to Uphold and, in exchange, Uphold promised to transfer 125,000,000 tokens to them.

Finally, on October 24, 2018, Uphold executed a TSA with Dekrypt Ventures I L.P., in which Uphold agreed to transfer 62,500,000 tokens to that Buyer in exchange for $500,000.

The TSA defined the "Vendor" as a yet-to-be formed "company incorporated in Singapore to be named 'Universal Protocol Pte. Ltd.' (or if such name is unavailable, such other similar name as determined by the Project Group)." It provided that Uphold "is entering into this Agreement in the capacity of a proxy on behalf of the Vendor prior to the Vendor's incorporation with the intention that this Agreement will be ratified by the Vendor after its Incorporation," as allowed under section 41 of Singapore's Companies Act. Thieriot signed the TSAs on behalf of Uphold, with Uphold signing on behalf of the yet-to-be incorporated company, Universal.

Central to this dispute is the TSA "Dispute Resolution" provision, section 7.12, which provides

> The Buyer and the Vendor shall cooperate in good faith to resolve any dispute or claim arising out of or in any way relating to this Agreement. If the Parties are unable to resolve such dispute or claim within 90 days, such dispute or claim shall be finally settled by arbitration, and judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant Party or its assets. The arbitration shall be conducted under the rules of the SIAC.[4] The arbitration tribunal shall consist of a sole arbitrator to be appointed by the President of the SIAC. The language of the arbitration shall be English.

---

[4] The TSA defines the "SIAC" as the Singapore International Arbitration Centre.

- 4 -

Uphold moved to compel arbitration of the Buyers' claims under section 7.12. The Buyers argued that only the "Vendor," Universal—and not its proxy, Uphold, nor any of its affiliated companies, officers or directors—could invoke the arbitration clause of the TSA. The trial court denied Uphold's motion on April 20, 2021. Uphold appeals.

ANALYSIS

Uphold challenges the trial court's order denying its motion to compel arbitration. We review this decision de novo. Satomi Owners Ass'n v. Satomi, LLC, 167 Wn.2d 781, 797, 225 P.3d 213 (2009). The party opposing arbitration bears the burden of showing that the agreement is not enforceable. Zuver v. Airtouch Commc'ns, Inc., 153 Wn.2d 293, 302, 103 P.3d 753 (2004).

A. The Federal Arbitration Act

Uphold argues that the FAA governs the arbitrability of the Buyers' claims. We agree. The FAA provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. This section declares a national policy favoring arbitration of claims that parties contract to settle in that manner. Satomi, 167 Wn.2d at 798. The effect of this section is to create a body of federal substantive law of arbitrability, applicable to any agreement within the coverage of the act. Id. Both state and federal courts must enforce this body of law. Id.

The FAA applies to transactions involving economic activity in interstate commerce. Id. at 799 (FAA applied to arbitration agreement between developers and homeowner association for construction defect claims). The FAA applies to the Buyers' token sales because, like Satomi, the transactions involve interstate commerce. AXRP is a Cayman Islands corporation. Dekrypt Master Fund and Dekrypt Ventures are British Virgin Islands limited partnerships. They each agreed to purchase "BTC," defined as "bitcoin, the cryptographic token associated with the Bitcoin cash blockchain." Each designated a "Buyer Token Receiving Address" on the "Ethereum blockchain" to which Uphold Ltd., a Cayman Islands limited liability company, agreed to transfer the digital tokens.[5] The Ethereum blockchain is an open source, decentralized platform on the Internet used to issue custom digital assets. U.S. Sec. & Exch. Comm'n v. Kik Interactive, Inc., 492 F. Supp. 3d 169, 174 (S.D.N.Y. 2020). Virtual currencies, such as Bitcoin, are commodities in interstate commerce. McDonnell, 287 F. Supp. at 228 (virtual currencies can be regulated by the Commodities Futures Trading Commission). The nature of the transactions here make the arbitration provision in the TSA subject to the FAA.

B. Arbitrability under the FAA

Under the FAA, arbitration is a matter of contract and courts must enforce arbitration contracts according to their terms. Henry Schein, Inc. v. Archer & White Sales, Inc., __ U.S. __, 139 S. Ct. 524, 529, 202 L. Ed. 2d 480 (2019); AT&T

---

[5] Virtual currencies are generally defined as digital assets used as a medium of exchange. Commodity Futures Trading Comm'n v. McDonnell, 287 F. Supp. 3d 213, 218 (E.D.N.Y. 2018). They are stored electronically in digital wallets and exchanged over the Internet through a direct peer-to-peer system. Id. They are often called "cryptocurrencies" because they use "cryptographic protocols to secure transactions . . . recorded on publicly available decentralized ledgers," called "blockchains." Id.

Mobility LLC v. Concepcion, 563 U.S. 333, 344, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011). But a party cannot be required to submit to arbitration any dispute which it did not agree to resolve in that forum. AT&T Techs., Inc. v. Commc'ns. Workers of Am., 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986). Thus, a court must resolve any issue that calls into question the validity or applicability of an arbitration clause. Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 297, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010).

The court's role under the FAA is to determine (1) whether a valid agreement to arbitrate exists, and (2) whether the agreement encompasses the dispute at issue. Shivkov v. Artex Risk Solutions, Inc., 974 F.3d 1051, 1058 (9th Cir. 2020).[6]

1. Existence of Valid Arbitration Agreement

The parties agree that the TSA contains a valid arbitration clause, but disagree as to who may benefit from that contractual provision. Uphold maintains that all of the Uphold affiliated companies, as well as Thieriot and Schatt, can compel arbitration, regardless of whether they signed the TSA, because the arbitration agreement extends to all members of the Universal Protocol Alliance "Project Group." The Buyers, however, contend that the arbitration agreement extends to only the "Parties" to the TSA, defined by contract as the "Buyer" and the "Vendor," Universal.

---

[6] The Third and Eighth Circuits apply the same test. See Sommerfeld v. Adesta, LLC, 2 F.4th 758, 761 (8th Cir. 2021); In re Remicade (Direct Purchase) Antitrust Litig., 938 F.3d 515, 519 (3rd Cir. 2019).

State law principles, and not—as Uphold argues—federal law, governs our interpretation of paragraph 7.12 and our determination of who can invoke the right to arbitration. In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995), the Supreme Court held that in deciding whether parties have agreed to arbitrate, courts apply ordinary state law principles governing the formation of contracts. In Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009), the Supreme Court reiterated that the FAA does not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." Thus, whether Uphold is a "party" to the TSA entitled to compel arbitration and whether the affiliated Uphold companies, Thieriot, and Schatt, as nonsignatories, may invoke arbitration under the FAA are questions to be resolved by state contract law.

The next question is which state law to apply—the law of the forum state, Washington, as the Buyers contend, or the law of Singapore, the parties' choice of law in their contract, as Uphold contends. Choice of law is a question of law that we review de novo. Erwin v. Cotter Health Ctrs., 161 Wn.2d 676, 691, 167 P.3d 1112 (2007).

The TSA includes a choice of law provision:

> Governing Law. This Agreement shall be governed in all respects, including as to validity, interpretation, and effect, by the Laws of Singapore, without giving effect to its principles or rules of conflict of laws, to the extent such principles or rules are not mandatorily applicable by statute and would permit or require the application of the Laws of another jurisdiction (emphasis added).

"[I]n resolving disputes concerning choice of law the court need decide (1) whether there is an actual conflict of laws and, if so, (2) whether the parties' agreement's choice of law provision is effective." Shanghai Commercial Bank Ltd. v. Kung Da Chang, 189 Wn.2d 474, 480, 404 P.3d 62 (2017) (citing Erwin, 161 Wn.2d at 692). " 'When parties dispute choice of law, there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before Washington courts will engage in a conflict of laws analysis.' " Id. at 480–81 (quoting Seizer v. Sessions, 132 Wn. 2d 642, 648, 940 P.2d 261 (1997)).

We conclude that under either Singapore or Washington law, the answer is the same—Uphold is a signatory and thus a party to the TSA and can compel arbitration. The other affiliated Uphold companies, as well as Thieriot and Schatt, may invoke the arbitration agreement under either Singapore's third party beneficiary statute or the Washington doctrine of equitable estoppel.

First, under Singapore law, Uphold signed the TSA and is a party to that agreement. The TSA recitals specifically refer to and incorporate by reference section 41 of Singapore's Companies Act (Chapter 50).[7] Under this statute,

(1)  Any contract or other transaction purporting to be entered into by a company prior to its formation or by any person on behalf of a company prior to its formation may be ratified by the company after its formation and thereupon the company becomes bound by and entitled to the benefit thereof as if it had been in existence at the date of the contract or other transaction and had been a party thereto.

(2) Prior to ratification by the company the person or persons who purported to act in the name or on behalf of the company are, in the absence of express agreement to the contrary, personally bound by contract or other transaction and entitled to the benefit thereof (emphasis added).

---

[7] Available at https://sso.agc.gov.sg/Act/CoA1967.

Uphold signed the TSA on behalf of Universal, a company that Uphold had yet to form. The Companies Act thus provides that Uphold, acting as Universal's proxy prior to its incorporation, is legally bound by, and entitled to any benefits set out in, the TSA. Because Uphold is a party to the TSA by operation of law, the defined party, "Vendor," includes both Uphold and the yet-to-be formed corporation, Universal. Under paragraph 7.12, Uphold has the right to compel arbitration as a party to the TSA.

Washington law is in accord. A promoter[8] who signs a contract for the benefit of a corporation that is not yet in existence is generally considered a party to that agreement. Goodman v. Darden, Doman & Stafford Assocs., 100 Wn.2d 476, 478-79, 670 P.2d 648 (1983). This rule is based on the strong inference that a person intends to make a present contract with an existing person. Id. at 479 (citing White & Bollard, Inc. v. Goodenow, 58 Wn.2d 180, 184, 361 P.2d 571 (1961)). Accordingly, "there may be multiple parties on one side of the contract even though signed only in the name of the corporation." White v. Dvorak, 78 Wn. App. 105, 112, 896 P.2d 85 (1995).

The Buyers knew that Universal had not yet been incorporated at the time they entered into the contract and knew that Uphold was acting as Universal's "proxy." Black's Law Dictionary defines the term "proxy" as "[s]omeone who is authorized to act as a substitute for another." BLACK'S LAW DICTIONARY 1482 (11th

---

[8] In the corporate context, a promoter is one who "forms a corporation and procures for it the rights, instrumentalities and capital to enable it to conduct its business." Goodman v. Darden, Doman & Stafford Assocs., 100 Wn.2d 476, 478 n.2, 670 P.2d 648 (1983). Because Uphold undertook to sell UPT tokens and raise capital "in furtherance of the establishment and launch of the 'Universal Protocol' project," Uphold is a promoter of Universal.

ed. 2019).  Uphold signed the TSA "for and on behalf of" Universal, and, prior to Universal's incorporation, evidencing the parties' intent to allow Uphold to act as the substitute for the "Vendor."  Thus, under Washington law, as under Singapore law, Uphold is a party to the TSA as the promoter of a yet-to-be formed corporation and is entitled to seek arbitration under paragraph 7.12 of the TSA.

Second, the affiliated Uphold companies, Thieriot, and Schatt are similarly entitled to invoke the arbitration provision of the TSA under both Singapore and Washington law.  Paragraph 7.11 of the TSA grants to Uphold, and its affiliates, rights under Singapore's third party beneficiary statute, Contracts (Rights of Third Parties) Act (Chapter 53b).  Under section 2(1) of that statute, "a person who is not a party to a contract . . . may, in [his] own right, enforce a term of the contract if— (a) the contract expressly provides that [he] may; or (b) . . . the term purports to confer a benefit on [him]."[9]

The TSA explicitly confers benefits on Uphold, as the proxy, and its affiliated companies, officers and directors.  Section 6.1, entitled "DISCLAIMER, LIMITATIONS, AND INDEMNITY" declares that "[n]either this agreement nor the purchase of the Buyer Tokens provides the Buyer with any claim whatsoever with respect to the Vendor, the Project Group, the Proxy, their respective Affiliates, and/or their respective assets."[10]  Section 6.2 requires the Buyers to indemnify and hold harmless Universal, Uphold, their affiliates, and their respective officers and directors for any claims resulting from any warranty made by the Buyers or any

---

[9]  Available at: https://sso.agc.gov.sg/Act/CRTPA2001.

[10] The Buyers characterize Uphold HQ, Uphold Inc., and Uphold Ltd. as affiliated entities in their complaint.

breach of agreement by Buyers.  Schedule 3 to the TSA sets the limitations period for any claims against Universal and Uphold to six months.  And it disclaims all liability of Universal and Uphold for any consequential damages.  These provisions trigger section 2(1) of Singapore's Contracts (Rights of Third Parties) Act.

Section 9(1) of that same statute provides

[w]here a right under section 2 to enforce a term (called in this section the substantive term) is subject to a term providing for the submission of disputes to arbitration . . . the third party is treated for the purposes of the Arbitration Act 2001 or the International Arbitration Act 1994 (as the case may be) as a party to the arbitration agreement as regards disputes between [himself] and the promisor relating to the enforcement of the substantive term by the third party.

Here, the Buyers seek to rescind the TSA, which would nullify the contractual benefits conferred on the nonsignatory affiliated entities, officers and directors.  Paragraph 7.12 provides that all disputes "arising out of" or "in any way relating to" the TSA must be arbitrated.  This broad language makes the third party beneficiaries' right to enforce the TSA subject to the arbitration provision.  Again, by operation of Singapore law, as referenced in the TSA itself, the Uphold affiliated companies, Thieriot, and Schatt, are all parties to the TSA for purposes of enforcing rights conferred on them under the agreement, including the right to invoke the arbitration clause to resolve disputes with the Buyers.

Even if Singapore law does not govern, Washington law leads us to the same result.  Several traditional principles of state law allow a contract to be enforced by or against nonparties.  Arthur Andersen, 556 U.S. at 631.  One such principle is equitable estoppel.  Id.; GE Energy Power Conversion France SAS,

Corp. v. Outokumpu Stainless USA, LLC, __ U.S. __, 140 S. Ct. 1637, 1644, 207 L. Ed. 2d 1 (2020).

Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that the contract imposes. Townsend v. Quadrant Corp., 173 Wn.2d 451, 461, 268 P.3d 917 (2012) (citations omitted). In David Terry Investments, LLC-PRC v. Headwaters Development. Group Limited Liability Company, 13 Wn. App. 2d 159, 171, 463 P.3d 117 (2020), Division Three of this court held that "the equitable estoppel doctrine applies when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are 'based on the same facts and are inherently inseparable' from arbitrable claims against signatory defendants." Id. (quoting Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993)). Courts applying equitable estoppel against a signatory have looked to whether the claims the nonsignatory sought to arbitrate were "intimately founded in and intertwined with the underlying contract obligations." Id. (quoting Choctow Generation Ltd. P'ship v. Home Assur. Co., 271 F3d 406 (2d Cir. 2001)).

Here, as in David Terry, the Buyers, who are all signatories to the TSA, brought suit against nonsignatories, the Uphold affiliated companies, Thieriot, and Schatt, based on the same facts and seeking the same relief as the claims they assert against Uphold, a signatory defendant. The Buyers' claims for violation of the WSSA and negligent misrepresentation are inherently tied to their agreement for the purchase of cryptocurrency tokens. The Buyers' claims necessarily turn on the construction of the contract and representations allegedly made by Uphold,

Thieriot, and Schatt, in their respective roles promoting the TSA. And a resolution of these claims will require resolution of contract defenses Uphold and its affiliates may have. Because the Buyers' claims and Uphold's defenses are founded in and intertwined with the underlying contract, we conclude the Buyers are equitably estopped from circumventing the arbitration provision in the TSA.

The Buyers argue that Singapore law does not govern because the TSA choice of law provision is invalid under Ito Int'l Corp. v. Prescott, Inc., 83 Wn. App. 282, 921 P.2d 566 (1996). In that case, a Japanese general partnership, formed to operate a building in downtown Seattle, marketed the building for sale. Id. at 285. It sold shares in the building to 36 investors, mostly Japanese individuals and to a Japanese-owned Washington corporation. The partnership agreement provided that the entity had been formed under, and was to be regulated by, Japanese law. It excluded the application of Washington partnership law but selected Washington law to apply to any issues concerning title to the real property. Id. at 287-88.

A group of investors sued under the WSSA and the trial court ruled that the investors' partnership interests were not securities under that statute. Id. at 288. The parties agreed that if Japanese law applied, the general partnership was not a security. Id. The investors argued on appeal that the choice of Japanese law in the partnership agreement was invalid under the WSSA. Id. at 288. RCW 21.20.430(5) renders void any contract provision waiving compliance with the WSSA. Because it deemed the choice of law provision to be a waiver of compliance with the WSSA, the court refused to enforce that clause and instead

conducted an independent choice of law analysis. Id. It concluded that while both Washington and Japan had significant contacts with the transaction at issue, public policy favored the application of Washington law because Washington residents were involved in the sale, Ito was a Washington corporation, and the property was located here. Id. at 290.

We cannot conclude, on the briefing before us, that the TSA choice of Singapore law constitutes a waiver of compliance with the WSSA. Neither party has briefed whether digital currency sales are considered the sale of securities under Singapore law. Moreover, Ito did not involve the validity of a choice of law provision in the context of interpreting an arbitration agreement. The Buyers here conflate the validity of a choice of law provision for interpreting an agreement, with the validity of a choice of law provision that may result in a waiver of a state statutory claim, such as the WSSA, and thereby violate the WSSA's anti-waiver provision. It is the former issue we confront, not the latter.

Under the FAA, if a dispute is arbitrable, the law governing the merits of such a dispute must be resolved by the arbitrators, not this court. See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540, 115 S. Ct. 2322, 132 L. Ed. 2d 462 (1995) (under the FAA, the arbitrators—and not the courts—decide, in the first instance, what law they will apply to particular claims); PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 123 S. Ct. 1531, 155 L. Ed. 2d 578 (2003) (issue of whether plaintiffs can recover treble damages under the Racketeer Influenced and Corrupt Organizations Act in arbitration is not ripe on motion to compel arbitration); Zuver v. Airtouch Commc'ns, Inc., 153 Wn.2d 293,

103 P.3d 753 (2004) (validity of attorney fee provision in agreement to be determined by arbitrator, not the court). The Buyers are free to argue to the arbitrator that any provision waiving compliance with the WSSA is invalid, just as the investors did in Ito.

We conclude that under either Singapore or Washington law, the Uphold Companies, Thieriot, and Schatt may compel arbitration of the Buyers' claims.[11]

2. Arbitrability of Buyers' WSSA and Negligent Misrepresentation Claims

Uphold contends, and the Buyers appear to concede, that the arbitration agreement encompasses their WSSA and misrepresentation claims. We agree.

Whether a particular dispute is arbitrable appears to be a question of federal law. In Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed.2d 765 (1983), the Supreme Court stated that generally, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." The Eighth and Ninth Circuits, relying on Moses H. Cone, have held that whether a particular claim is arbitrable is governed by federal substantive law on arbitration, including a presumption in favor of arbitration. Donaldson Co. v. Burroughs Diesel, Inc., 581 F.3d 726, 731 (8th Cir. 2009); Shivkov, 974 F.3d at 1058-59; Benson v. Casa de Capri Enters., LLC, 980 F.3d 1328, 1330–31 (9th Cir. 2020).

This court has also recognized that the arbitrability of specific claims is a matter of federal law under the FAA. In Kamaya Co., v. American Property

---

[11] The Buyers also argue that we should not rely on Singapore law because both parties briefed their arguments below and on appeal on the assumption that Washington law controls the issue. Because we conclude the resolution would be the same under either Singapore or Washington law, we need not decide whether Uphold waived the application of foreign law.

Consultants, Ltd., 91 Wn. App. 703, 959 P.2d 1140 (1998), a group of investors in a Japanese real estate partnership appealed an order compelling them to arbitrate their fraud-in-the-inducement claim. Id. at 707. The investors argued that fraud claims were not arbitrable under Japanese law, the parties' choice of law in the agreement. Id. This court rejected that argument, holding that under Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH, 585 F.2d 39 (3rd Cir. 1978), federal law under the FAA, and not Japanese law, governed whether the claim was arbitrable. We stated that while contractual choice of law provisions are ordinarily valid under the FAA, "it is axiomatic that courts must have some law to apply when determining whether the parties agreed to arbitrate a particular dispute. The FAA provides courts with this necessary analytical framework." Id. at 713. We held that "whether a particular dispute is within the class of those disputes governed by the arbitration and choice of law clause is a matter of federal law." Id. (quoting Becker, 585 F.2d at 43). In applying federal law, this court concluded that under the FAA, the investors' fraud claim was arbitrable.[12] Id. at 718.

We conclude that the Buyers' WSSA and negligent misrepresentation claims are arbitrable. Under federal arbitration law, causes of action premised on statutory rights are subject to contractual arbitration agreements just as are claims

---

[12] In re Remicade (Direct Purchaser) Antitrust Litig., 938 F.3d 515, 520 (3rd Cir. 2019), the Third Circuit explicitly abrogated Becker, the case on which Kamaya relied, and held that federal substantive law, including the presumption in favor of arbitration, applies only when state interpretative principles do not dictate a clear outcome or when the FAA preempts a state law prohibiting the arbitration of certain claims or transactions. It applies state law to interpret the scope of an arbitration clause to determine a particular claim's arbitrability. Id. at 522. Given that the Ninth Circuit relies on federal law and Kamaya is consistent with this line of federal cases, we will follow Kamaya here.

under the common law. <u>Kilgore v. KeyBank, Nat'l Ass'n</u>, 673 F.3d 947, 955 (9th Cir. 2012), <u>on reh'g en banc,</u> 718 F.3d 1052 (9th Cir. 2013).

The Buyers contend that forcing them to resolve their WSSA claim via arbitration in Singapore violates Washington public policy. We reject this argument. In <u>Garmo v. Dean, Witter, Reynolds, Inc.</u>, 101 Wn.2d 585, 590, 681 P.2d 253 (1984), our Supreme Court held that WSSA claims are arbitrable under the FAA. This binding precedent settled any contention that a party cannot agree to arbitrate this statutory claim.

The Buyers suggest it would be unfair to force them into a proceeding thousands of miles from Washington. The Buyers provide no authority for this proposition. In <u>Yei A. Sun v. Advanced China Healthcare, Inc.</u>, 901 F.3d 1081, 1090 (9th Cir. 2018), the Ninth Circuit held that a forum-selection clause in a stock purchase agreement, designating California state courts as the forum for any litigation, applied to claims arising under the WSSA and did not violate the public policy of this state. We agree. If it does not violate Washington public policy to require parties to arbitrate WSSA claims, and does not violate Washington public policy to require parties to litigate such claims in an out-of-state forum, we see no public policy violation in allowing an international arbitration organization to address the Buyers' WSSA claims.

Moreover, while the TSA specifies the rules governing the arbitration (those of the Singapore International Arbitration Centre), the number of arbitrators (one), and the language in which the proceeding will be conducted (English), it does not require that the seat of the arbitration be Singapore. Under Rule 21 of the SIAC

Rules of Arbitration, the parties may select the seat of the arbitration and, in the absence of such an agreement, the arbitrator will select the location for the proceedings.[13]  There is nothing in the TSA that requires the Buyers to travel to Singapore to arbitrate their WSSA and negligent misrepresentation claims.

We conclude that the TSA's arbitration provision requires the Buyers to arbitrate their claims against Uphold, its affiliated companies, Thieriot and Schatt. We remand for entry of an order compelling arbitration.

C. Attorney Fees

Uphold argues that it is contractually entitled to attorney fees and costs for having to compel arbitration.  It relies on section 6.2 of the TSA which provides:

> The Buyer shall defend, indemnify, and hold harmless the Vendor, the Proxy, the Project Group, their Affiliates, and their respective officers, directors, employees, agents, successors and assigns (collectively the 'Indemnified Persons') from and against, and pay or reimburse the Indemnified Persons for a breach or any claim, any and all losses resulting from: (a) any inaccuracy in or breach of any representation or warranty when made or deemed made by the Buyer in or pursuant to this Agreement; or (b) any willful or negligent breach of or default in performance by the Buyer under this Agreement.

Uphold interprets this provision as requiring the Buyers to indemnify them for any legal fees it incurred to litigate the arbitrability of the Buyers' claims.  But under the specific language of paragraph 6.2, Uphold is entitled to such a recovery only if it proves that the Buyers breached a representation or warranty or that the Buyers breached or defaulted in performance under the TSA.  Arguably, the Buyers' failure to accede to Upholds' demand for arbitration could be deemed a breach of the TSA.  But it is not a claim we can adjudicate here as that claim is also subject to

---

[13] https://www.siac.org.sg/our-rules/rules/siac-rules-2016 (last visited January 3, 2022).

arbitration and should be resolved in that forum.  We decline to reach the issue of Uphold's entitlement to an award of legal fees.

We award Uphold its costs as the prevailing party on appeal under RAP 14.2.

Reversed and remanded for entry of an order compelling arbitration.

_Andrus, A.C.J._

WE CONCUR: